[Cite as *State v. White*, 2016-Ohio-3329.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | APPEAL NO. C-150250 |
| | | TRIAL NO. B-1306375 |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | |
| | | *O P I N I O N.* |
| JULIUS WHITE, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  June 10, 2016

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Wendy R. Calaway,* for Defendant-Appellant.

**CUNNINGHAM, Judge.**

{¶1} Defendant-appellant Julius White appeals from the judgment of the Hamilton County Court of Common Pleas convicting him, after a jury trial, of aggravated murder, in violation of R.C. 2903.01(B), and a firearm specification. White argues (1) that he was denied his right to a trial by an impartial jury because the trial court refused to dismiss a juror who expressed concern over retribution, (2) that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence, (3) that he was denied his right to the effective assistance of trial counsel, (4) that the trial court improperly instructed the jury, and (5) that the prosecutor engaged in misconduct during closing argument. For the reasons that follow, we affirm.

## I. Background Facts and Procedure

{¶2} Fourteen-year-old Dwayne Lewis was shot multiple times and killed on Knox Street in a secluded corner of the Fairmount area in Cincinnati late in the afternoon of October 15, 2013. Lewis, who lived in the Hawaiian Terrace housing complex located in the Mt. Airy area of Cincinnati, was last observed walking home from his school bus stop and reluctantly getting into a black Infiniti car with tinted windows that was parked at the complex. Lewis's friend Timothy Lindsey recalled that before getting into the car, Lewis seemed distressed. When Lindsey asked him what was wrong, Lewis replied, "Tell momma I love her, I'm about to go to my daddy['s] house."

{¶3} Lindsey also recalled that around that time two individuals had asked him about a break-in at "their people's house" and offered him money for information. When Lindsey replied that he did not know anything about it, the men walked away. From a distance, Lindsey saw one of those individuals enter a black Infiniti, along with another black male and Lewis. The car then drove off.

2

{¶4} Two other eyewitnesses saw men canvassing the neighborhood that afternoon for information about the break-in. One of those witnesses, 14-year-old Traevon Harris, identified White as person who was also present that day around a black Infiniti with Lewis. Harris additionally saw that when Lewis entered the black Infiniti, an individual other than White had pointed a gun at Lewis. Harris was interviewed by the police five days after the murder, and his interview was recorded.

{¶5} The day before Lewis was shot, White was in Paris, France, with his girlfriend, Kaiya Issacs. But he learned through his cousin Lakendra White ("Lakendra") that the townhouse in Hawaiian Terrace that he used and that contained drug-trafficking materials had been broken into and money had been taken. The townhouse was rented by Lakendra, who had messaged White on Facebook that "they broke into my fucking house."

{¶6} Before leaving for France, White had been the subject of a drug investigation. As a result of this investigation, law enforcement officials had obtained a warrant for a GPS tracker to be placed on the black Infiniti car registered to Issacs but regularly driven by White. The GPS device was placed on the black Infiniti after White had parked it in the long-term parking lot at the Cincinnati/Northern Kentucky International Airport, located in Hebron, Kentucky.

{¶7} White returned to Cincinnati in the early afternoon of October 15. The GPS tracker began to capture the location of the black Infiniti at 3:19 p.m. after the car had exited from the long-term parking lot. The GPS records showed the car travelled north to the Roselawn area in Cincinnati on Section Road where Issacs's mother lived. The car then travelled south to the downtown area and was recorded on Stark Street, where White's mother lived, at 4:19 p.m. According to these records, the car was stopped on Stark Street for less than five minutes.

{¶8} Between 4:39 p.m. and 4:51 p.m., the black Infiniti was at Hawaiian Terrace. This was the same time that Lewis was seen entering the car. The records

3

also show the car then travelled to the same secluded corner of Fairmount where Lewis was shot, and it was in that area at the same time that Lewis was shot based on a 911 call from a passerby that prompted a police dispatch at 5:11 p.m. The GPS records were corroborated by a surveillance camera that capture the image of a black Infiniti with tinted windows passing a residence down the road from where Lewis's body was found. The car passed the surveillance camera just before the residents heard gun shots and a few minutes before Lewis's body was discovered.

{¶9} On October 17, two days after the shooting, White hired a local company to remove the window tint from the black Infiniti. Then, on October 19, White was arrested. At the time of the arrest, the police located White's iPhone hidden behind a wall clock in the bathroom of the apartment where he was found. The phone, which was in a case that incorporated a photo of White, was wrapped in aluminum foil. A review of the web history on the device showed that White was following coverage of the murder by local news organizations, and two headlines had been saved as screenshots. All of the calling and text records for the time period of the murder had been deleted from the device.

{¶10} Although the calling and texting records for the relevant time period had been deleted from the iPhone, the police were able to subpoena those records as well as the cell-phone-location records of the iPhone from Verizon Wireless, White's cellular service provider. Those location records corroborated the GPS records and placed White at Hawaiian Terrace and in Fairmount at all relevant time periods. And the call log for the iPhone showed a call from that phone to Issacs's phone at 5:10 p.m. and to White's mother's phone at 5:25 p.m.

{¶11} At one point after White's arrest, White was incarcerated in the Butler County jail. White told Charles Sullivan, another inmate, that he had shot a 14 year old who had "broke[n] in his spot" in Hawaiian Terrace and stolen $100,000 to $200,000 in cash while White was in Paris. According to Sullivan, White also

4

mentioned other details of the crime, including that the victim had just arrived home from school on the bus when he was abducted by White and a man named Aundon. Additionally, White said that the victim was taken to the North Fairmount area in a black sports car. Sullivan shared this information with the police.

{¶12} Later, Sullivan received from another inmate a threatening note handwritten by White. White made reference to Sullivan "show[ing] up at [his] court date," and relayed to Sullivan that he had been told by "lil sticks" that "it wouldn't be nothing to get at yo mama a[nd] yo kids" in Cincinnati. White further threatened that a funeral would follow.

{¶13} White's DNA was found inside the black Infiniti, along with a photograph of White with two individuals known as Aundon and Young Sticks. Gunshot residue was found on the exterior of the car, indicating that a weapon had been fired nearby.

{¶14} Lewis's deceased body was discovered on Knox Street near empty shell casings, indicating that he was shot on the street. The location of his bullet wounds—in the nonvital areas of his ear, elbow, and thigh, and the fatal shot to his head—indicted that he may have been tortured during an interrogation.

{¶15} At White's trial, the state called various witnesses including Harris. Initially, Harris testified inconsistently with his prior statement to the police and was uncooperative. He claimed that he did not remember the police interview, but he later explained that he was afraid to testify about what he had seen. The court allowed Harris to consult with an attorney. Subsequently, Harris agreed to testify truthfully if granted immunity from prosecution for his perjury.

{¶16} After the trial court granted Harris immunity, Harris testified that, consistent with his earlier statement to the police, White was one of the men he had seen forcing Lewis into the black Infiniti. Harris admitted, however, that when he identified White during the photographic lineup during the police interview five days

after the murder, he had also recognized White's face from a news report announcing White's arrest in conjunction with the case.

{¶17} Sullivan testified as to the information he had learned from White at the Butler County jail about the crimes, including White's admission to shooting Lewis. The cross-examination of Sullivan revealed some conflicts between what Sullivan testified to and his statement to the police. But Sullivan maintained that White had admitted to pulling the trigger, and that he had told the police that, although he may not have communicated the information as clearly in his police statement.

{¶18} The final witness during the state's case-in-chief was Detective Gehring, who had investigated the homicide. Detective Gehring presented testimony explaining the significance of the GPS and cell-phone-location records. During his testimony, he detailed the path of the black Infiniti from the airport parking lot at 3:19 p.m. to a location on Section Road where White's girlfriend's mother lived. Later that day, the defense presented Tonya White ("Tonya"), the defendant's mother, as the first witness for the defense. Her testimony was elicited to support the defense's theory that White's cousin Demetrius White ("Demetrius") had killed Lewis after driving off in the black Infiniti with White's iPhone.

{¶19} Contrary to the GPS and cell-phone records, Tonya testified that after White had returned from Paris, he had arrived at her home on Stark Road in the "early afternoon," around 2:30 p.m. At the time, Demetrius was inside her home. She recalled that White and Demetrius, who goes by "Money Meech," had a heated discussion, and Demetrius left about four or five minutes later in the black Infiniti, but White stayed behind and was still at her home when she left for dinner. Tonya was adamant that she had left for dinner no later than 4:00 p.m., but the GPS and cell records did not place the black Infiniti at her home until 4:19 p.m.

6

{¶20} Tonya further testified that White's girlfriend typically drove the black Infiniti and White typically used a white Nissan registered to his cousin Lakendra. But Tonya conceded that White also regularly drove the black Infiniti.

{¶21} The jury subsequently found White guilty of aggravated murder, murder, kidnapping, and felonious assault, all with firearm specifications. The trial court convicted White of aggravated murder with a firearm specification and merged the other offenses into that offense. White now appeals, raising five assignments of error.

## II. Biased-Juror Claim

{¶22} In his first assignment of error, White argues that his right to an impartial jury was violated by the trial court's failure to excuse a juror who expressed a concern over safety during the trial.

{¶23} The issue arose during a break in the course of White's mother's testimony. Juror One notified the bailiff that the witness's testimony raised a concern. The trial court called Juror One into chambers for questioning. During this questioning, Juror One informed the court that he believed the defendant's mother lived on Section Road near him and he was concerned that someone in the neighborhood might recognize him as a member of White's jury. The court informed the juror that the witness testified she lived on Stark Street in a different neighborhood. The attorneys noted that Section Road may have been mentioned earlier in the day with respect to the GPS evidence or cell-phone records. Defense counsel then asked Juror One, with the court's permission, "Now that we've settled that, this isn't going to affect your ability to remain fair and impartial, is it?"

{¶24} Although Juror One had indicated during voir dire that he could be fair and impartial to both parties, he replied, "I'm still questioning when I have all of the facts straight in my head now. But if there is some connection to the Defendant that is close to my address, I do have some concerns, yes. That is why I'm here."

7

After recognizing that it was late in the case, he continued, "I have a very strong commitment to do a duty here but I have a family as well. And I have some concerns."

{¶25} The court then informed Juror One that no one but counsel knew his address. Yet Juror One persisted in expressing concern for his family. The prosecutor then confirmed that no one had approached Juror One and that Juror One had given his full attention to the case. The prosecutor next asked, "[t]he only issue is your ability to listen to the evidence, come back with a verdict based on what you hear in this courtroom, and do so with the understanding that—that you are doing so openly and honestly towards all parties involved. And do you believe that you could do that?" Juror One replied, "Yes. This is kind of sudden to me. So I'm kind of processing this all right now."

{¶26} Upon further questioning by defense counsel, Juror One clarified that his concern was not about the defendant, but instead involved a fear of retribution on behalf of the defendant from someone who recognized him in the neighborhood.

{¶27} Defense counsel requested the trial court excuse Juror One, contending that "he's already found [the defendant] guilty" and "is worried about retribution." The state opposed the request, arguing that Juror One never indicated that he had arrived at a conclusion, and Juror One's concern involved his erroneous belief that the defendant's mother lived on Section Road near him. The court corrected the prosecutor and said Juror One was concerned about "living next to an address that was connected to the case," and decided to take the matter under advisement.

{¶28} At the conclusion of testimony for the day, the trial court told the parties that it had reviewed the transcript from Detective Gehring's testimony and confirmed that Section Road was mentioned in connection with the address of Kaiya's mother. The court then inquired about and learned that neither Kaiya nor

her mother was scheduled to testify in the case. The court expressly stated that it would consider that information when ruling on the motion.

{¶29} The following morning, defense counsel asked the court when it wished to address the motion to excuse Juror One. The court indicated that it would address it just before submitting the case to the jury. The court then stated, "[i]f I'm down to 12 jurors for some reason, * * * I'm probably not going to excuse him. You'll have an issue for appeal. * * * If we have 12 jurors plus one, I will more likely grant it. I haven't made my mind up on it."

{¶30} Three days later, before submitting the case to the jury, the court denied the motion to excuse Juror One. The court also noted that the alternate juror was with her husband in the hospital that morning, and that they would proceed with just 12 jurors. Defense counsel then unsuccessfully moved for a mistrial.

{¶31} White maintains that the court erred by failing to dismiss Juror One, contending that the juror demonstrated bias and prejudice and an inability to be impartial by expressing a concern for his safety. According to White, the trial court based the decision on expediency and without regard for his constitutional rights.

{¶32} White had a right under the federal and state constitutions to a trial before an "impartial jury." *See State v. Jaryga*, 11th Dist. Lake No. 2003-L-023, 2005-Ohio-352, ¶ 72. Before the conclusion of a trial, a trial judge is empowered to remove a juror and replace the juror with an alternate whenever facts are presented that convince the trial judge that the juror's ability to perform his duty—including the duty to be impartial—is impaired. *State v. Hopkins*, 27 Ohio App.3d 196, 197, 500 N.E.2d 323 (11th Dist.1985); *see* Crim.R. 24(G); R.C. 2945.29. A juror's concern for safety, standing alone, is not sufficient to demonstrate a juror's impairment and warrant a new trial. *State v. Garcia*, 8th Dist. Cuyahoga No. 79917, 2002-Ohio-4179, ¶ 86, quoted in *State v. Carter*, 7th Dist. Jefferson No. 05JE7, 2007-Ohio-3502, ¶ 17.

{¶33} Generally, the test for juror impartiality is whether a juror's views will impair the juror's judgment to the extent that the juror would not be able to faithfully and impartially determine the facts and apply the law according to instruction of the court by "render[ing] a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Dayton v. Gigandet*, 83 Ohio App.3d 886, 891-892, 615 N.E.2d 1131 (2d Dist.1992).

{¶34} The trial court is vested with "broad discretion" when determining a juror's ability to be impartial. *State v. Dennis*, 79 Ohio St.3d 421, 427, 683 N.E.2d 1096 (1997), citing *State v. Williams*, 6 Ohio St.3d 281, 288, 452 N.E.2d 1323 (1983). The resolution of the impartiality issue relies in large part on the trial court's assessment of the juror's credibility and demeanor and the context in which the issue arises. *See Skilling v. United States*, 561 U.S. 358, 386, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010); *State v. Williams*, 79 Ohio St.3d 1, 8, 679 N.E.2d 646 (1997). *See also United States v. Ruggiero*, 928 F.2d 1289, 1300 (2d Cir.1991) (refusing to "second guess the conclusion of the experienced trial judge, based in large measure upon personal observations that cannot be captured on a paper record, that [the juror] was disabled by fear from continuing to participate in the jury's deliberations").

{¶35} We review the trial court's decision on whether to remove a juror for bias only for an abuse of discretion. *State v. Wyatt*, 9th Dist. Summit No. 22070, 2004-Ohio-6546, ¶ 6, citing *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 80; *Hopkins*, 27 Ohio App.3d at 198, 500 N.E.2d 323. The court abuses its discretion when it issues a decision that is "unreasonable, arbitrary or unconscionable." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34, citing *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶36} White has failed to demonstrate that the trial court abused its discretion in retaining Juror One. Admittedly, the juror cited safety concerns, but

those concerns were not tied to any actual threats. Consistent with the law, the trial court questioned Juror One in chambers about his concern for safety, reassured him that his address was not shared, and learned that the juror was likely mistaken about the basis for his concerns. The juror's only specific concern involved a witness—the defendant's mother—whom he believed lived on his street and could recognize him for that reason. But as the trial court later reported to the parties, the juror was mistaken about where the witness lived. And the court confirmed that no one living on the juror's street would be testifying.

{¶37} Importantly, the juror also indicated, upon questioning, that he could return a verdict based on the evidence—what he heard in the courtroom—and that he would act "openly and honestly towards all parties involved." Significantly, the juror did not come forward again with any similar concerns, and he never indicated that he could not be impartial. The trial court was in the best position to assess the juror's credibility and demeanor and place the issue into context.

{¶38} The trial court did consider the number of available potential jurors in exercising its discretion. This does not, alone, demonstrate reversible error. "A valid concern [for the trial court when exercising its duties with respect to the jury] may be the expense and loss of time associated with a new trial," but "the court must give primary attention to the possibility of a biased juror." *United States v. Thompson*, 744 F.2d 1065, 1068 (4th Cir.1984), citing *United States v. Taylor*, 554 F.2d 200 (5th Cir.1997).

{¶39} Here, the record demonstrates that White's constitutional right to an impartial jury dominated over the concern of expediency. The trial court mentioned the expediency factor only after the in-chambers questioning and after the court's confirmation of the relevant factual context demonstrated that the removal of the juror was unnecessary. Under these circumstances, we find no abuse of discretion, and we overrule the first assignment of error.

### III. Sufficiency and Weight-of-the-Evidence Claims

{¶40} In his second assignment of error, White argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. White was convicted of aggravated felony murder in violation of R.C. 2903.01(B), with a three-year firearm specification. The state's theory was that White had purposely caused Lewis's death during the kidnapping. The state proceeded against White as either a principal offender or as an accomplice who had aided and abetted in the commission of the offense, as defined in R.C. 2923.03(A)(2).

{¶41} White essentially raises two arguments when challenging the sufficiency of the evidence. First, he contends that the state's case against him was based entirely on speculation, as evinced in part by the state's decision to proceed against White as a principal and as an accomplice. Second, White argues that there was no evidence that Lewis was removed from the Hawaiian Terrace by "force, threat, or deception"—as required by R.C 2905.01, the kidnapping statute. We reject both arguments.

{¶42} When reviewing a claim based on the sufficiency of the evidence, this court must view all evidence and reasonable inferences in the light most favorable to the state, and determine whether the trier of fact could have found all the elements of the offense proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "Circumstantial evidence and direct evidence inherently possess the same probative value." *Id.* at paragraph one of the syllabus. Here, the record contains substantial evidence of White's guilt with respect to the aggravated murder of Lewis, and his conviction was not based on mere speculation.

{¶43} Although no one testified to seeing White shoot Lewis, the state presented overwhelming evidence that White committed the aggravated murder as

the principal or as an accomplice. With respect to complicity by aiding and abetting, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus.

{¶44} The evidence included testimony from Sullivan that White had admitted to pulling the trigger when talking to him in the Butler County jail. Further, there was a plethora of circumstantial evidence tying White to the crime. Of significance, there was evidence that White used his cousin's townhouse that had been broken into for drug activities, and that several individuals were canvassing the Hawaiian Terrace housing complex asking about the break-in just before Lewis had been driven away in a black Infiniti and shot.

{¶45} More importantly, compelling evidence supported the conclusion that White was in the black Infiniti that was used to kidnap Lewis and that was captured around the time of the shooting on a surveillance camera located near the scene. This included the cell-phone records for the cell-phone number associated with White and the GPS records for the tracker placed on the black Infiniti that White used. Additionally, Harris identified White as a person with Lewis when he had been kidnapped in the black Infiniti.

{¶46} White's evasive conduct after the shooting is also strongly indicative of his guilt. He had the dark tint on the Infiniti removed after news reports indicated that the police were searching for a black Infiniti with tinted windows. And White hid his cell phone, which had been wrapped in aluminum foil, behind a clock in his bathroom. The text and calling history on the phone had been deleted. Further, after confessing to Sullivan, White sent Sullivan a threatening letter related to Sullivan's potential testimony in court.

{¶47}    We conclude that the state met its burden with respect to proving that White was either a principal or accomplice in the aggravated felony murder of Lewis.

{¶48}  We also conclude that the state presented sufficient evidence that Lewis was kidnapped.   For instance, Harris testified that one of Lewis's assailants showed a gun after Lewis was directed to get into the black Infinity.   And Lindsey and Harris testified that Lewis asked Lindsey to "tell my momma I love her" before entering the car.   This evidence demonstrates that Lewis was taken by force.

{¶49}  Alternatively, the evidence supported a determination that Lewis was taken by deception.   One may reasonably infer based on Lindsey's testimony that Lewis's reference at that time to "going to [his] daddy's house" indicated Lewis was unaware that after entering that car he was going to be taken to a secluded area and shot.  In sum, we reject White's sufficiency claim.

{¶50}  We also reject White's claim that his conviction was against the manifest weight of the evidence.    White attacks the credibility of the state's witnesses, and specifically Harris.  But the jury was free to believe or disbelieve these witnesses, whose testimony was corroborated by the other evidence.  We note that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact.  *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶51}  Ultimately, we find nothing in the record of the proceedings below to suggest that the jury, in resolving the conflicts in the evidence adduced on the charged offense, lost its way and created such a manifest miscarriage of justice as to warrant the reversal of White's conviction.  *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  Accordingly, we overrule the second assignment of error.

### IV. Ineffective-Assistance-of-Trial-Counsel Claim

{¶52}  In his third assignment of error, White argues that he was denied the right to the effective assistance of trial counsel, because counsel failed to file a

14

motion to suppress Harris's out-of-court identification of White and to challenge the admissibility of Sullivan's jailhouse-informant testimony. We address each of these arguments in turn, after setting forth the law applicable to both arguments.

{¶53} To prevail on a claim of ineffective assistance of counsel, an appellant must show both that counsel's performance "fell below an objective standard of reasonableness," and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 694.

{¶54} White first contends that counsel was ineffective for failing to move for the suppression of Harris's out-of-court identification of White. But trial counsel's " 'failure to file a suppression motion does not constitute per se ineffective assistance of counsel.' " *State v. Magrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). To demonstrate that counsel's performance was deficient with respect to a suppression motion, the facts must demonstrate that the failure to move for suppression was not a reasonable tactical decision and that the motion would have been granted if filed. *See id.* With respect to prejudice, the defendant must demonstrate a " 'reasonable probability' " that without the deficient performance, the trier of fact would have had a " 'reasonable doubt concerning guilt.' " *Madrigal*, quoting *Strickland* at 695. Generally, there is no prejudice where " 'compelling evidence' " remains to support the conviction assuming the suppression motion would have been granted. *Id.*

15

{¶**55**} Whether the Due Process Clause requires the suppression of an eyewitness identification involves a two-step inquiry. First, the court must determine whether "law enforcement officers use[d] an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, __ U.S. __, 132 S.Ct. 716, 724, 181 L.Ed.2d 694 (2012). If so, the court must determine whether under the " 'totality of the circumstances,' " *id.* at 725, quoting *Manson v. Brathwaite*, 432 U.S. 98, 110, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the identification was nonetheless "reliable," and admissible, even though the confrontation procedure was "unnecessarily suggestive." *Id.*, citing *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Neal*, 1st Dist. Hamilton No. C-140677, 2015-Ohio-4705, ¶ 28.

{¶**56**} Six days after the murder, and two days after White had been arrested, Harris identified White from a sequential lineup involving six photos shown to him by Detective James Lewis, an officer uninvolved in the investigation. Before proceeding, Detective Lewis, a "blind administrator," had read information to Harris, consistent with R.C. 2933.83. This information included that Detective Lewis would be showing Harris a group of photographs, and that "this group of photographs may or may not contain the photograph of the alleged perpetrator of the offense now being investigated." Detective Lewis then instructed Harris, both orally and in writing, to "[i]ndicate whether the photograph being viewed is of the perpetrator of the offense being investigated."

{¶**57**} After receiving these oral and written instructions, Harris picked photo number 3, which was a filler photo, and photo number 4, White's photo. Referring to White's photo, Harris said, "I know him, I've seen him," Detective Lewis then asked, "You know him?" Harris replied that he didn't personally know him and asked if he was the person "that got locked up." Detective Lewis indicated that he did not know, and then said, "So you have seen him before?" Harris replied, "[t]his one, yes."

{¶58} Although White argues that Harris identified White only after "inappropriate prompting" by "the officer," he does not specify what was inappropriate about the procedure used by Detective Lewis. Instead, White provides citation to the trial transcript containing defense counsel's cross-examination of Detective Gehring, one of the investigators, about the allegedly improper prompting of Harris to implicate White during a follow-up interview. But at the time of Gehring's follow-up interview, Harris had already identified White as an individual present at the scene. Thus, Detective Gehring's conduct did not steer Harris to White.

{¶59} However, the testimony referenced by White shows two potentially questionable practices by the police before the follow-up interview. Just prior to Detective Lewis's meeting with Harris for the photo lineup, another detective had told Harris that he would be shown "several groups of photos" and that "each group of photos will have one of the people that we think did it * * * [but] [i]t doesn't mean they did it." Additionally, the photograph of White that Detective Lewis showed Harris was the same photograph the police had included in a press release announcing White's arrest two days earlier. We assume for purposes of argument only, and without deciding the issue, that under these circumstances, the police used "an identification procedure that [wa]s both suggestive and unnecessary," *Perry* at 724, and apply the second part of the *Perry* test.

{¶60} Thus, we inquire as "to whether under the totality of the circumstances, the identification was reliable even through the confrontation procedure was suggestive." *Perry* at 724. To evaluate the likelihood of misidentification, we focus on several factors, including but not limited to, Harris's opportunity to view the perpetrator at the time of the crime, the witness's degree of attention, the accuracy of the witness's description of the perpetrator, the level of certainty demonstrated by the witness at the time of the confrontation, and the time

17

between the crime and confrontation. *Neal*, 1st Dist. Hamilton No. C-140677, 2015-Ohio-4705, at ¶ 28, citing *Perry* at fn. 5, and *Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401. If an identification is deemed reliable, it is admissible, notwithstanding the improper procedure used by the police. *Neal* at ¶ 28, citing *Perry* at 725.

{¶61} White argues that the identification was not reliable because Harris was a distance away from the car and was under the influence of marijuana when he witnessed the incident, he admitted that he was focused on the gun, it was dark outside, and the incident occurred quickly. He also notes that Harris picked a filler photo of a person who was not there. But Harris was certain of his identification of Lewis when Detective Gehring questioned him about it in the follow-up interview and when he testified. Moreover, the record indicates that Harris was familiar with White—he was not a stranger. Thus, we agree with the state and conclude that under the totality of these circumstances the identification was reliable, even if the police employed a procedure that was unduly suggestive.

{¶62} Finally, even assuming that suppression was warranted, in light of the overwhelming proof of White's identity from the GPS and phone records and Sullivan's testimony, we cannot say a "reasonable probability" exists that without counsel's allegedly deficient performance, the jury would have had a reasonable doubt concerning guilt.

{¶63} Ultimately, White cannot demonstrate that defense counsel's failure to file a motion to suppress constituted the ineffective assistance of trial counsel.

{¶64} Next, White argues that trial counsel was ineffective for failing to challenge the admissibility of Sullivan's informant testimony. Sullivan testified that White had confessed to him while they were both housed in the Butler County jail, after White had been charged with aggravated murder.

{¶65} White first contends that Sullivan's testimony was inadmissible under a theory that Sullivan elicited the statement from White after White had allegedly

asserted his right to counsel. The state may not, consistent with the Sixth Amendment, use a jailhouse informant to deliberately elicit post-indictment incriminating statements from another inmate. *See United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

{¶66} But here, the facts show no Sixth Amendment violation by the state. There is no evidence that the state deliberately elicited the information from White through Sullivan. The evidence instead shows White shared the information with Sullivan during a casual, spontaneous conversation, and that Sullivan then contacted the police and subsequently shared the information with the police. Thus, White has failed to establish that counsel was ineffective for failing to challenge the admissibility of Sullivan's testimony on this ground.

{¶67} White contends that trial counsel should have challenged the admission of Sullivan's testimony for an additional reason, suggesting that jailhouse-informant testimony is always unreliable and inadmissible when the informant is offering the testimony in exchange for consideration in a criminal case. Although Sullivan testified that he did not contact the police to receive a reduction in a federal prison sentence, Detective Gehring testified that Sullivan's attorney had raised the issue when Sullivan met with the police.

{¶68} But White has failed to present any case law in support of his argument that Sullivan's testimony was per se unreliable and inadmissible for that reason. Even the testimony of a cooperating accomplice who is provided case consideration is not per se unreliable. *See State v. McCoy*, 1st Dist. Hamilton No. C-090599, 2010-Ohio-5810, ¶ 18-20.

{¶69} Here, trial counsel vigorously cross-examined Sullivan and requested a special cautionary jury instruction with respect to Sullivan's testimony. The trial court did not give the inappropriate special instruction, but it did instruct the jury to apply the "tests of truthfulness" when evaluating credibility, including any "interest

19

and bias." In light of this record, White has failed to show that trial counsel's performance was deficient because counsel did not object to the admission of Sullivan's testimony.

{¶70} White also contends that he was denied the effective assistance of counsel by the trial court's grant of the state's certification of nondisclosure of witnesses, the trial court's denial of defense counsel's request for a continuance, and the trial court's failure to allow access to discovery to permit counsel to challenge Sullivan's testimony. But as the state notes, these claims are not appropriately characterized as failures of White's counsel, who advocated on behalf of White with respect to the specified rulings. Because White failed to establish a claim based on the ineffective assistance of trial counsel, we overrule the third assignment of error.

## V. Erroneous-Jury-Instructions Claim

{¶71} White's fourth assignment of error assails the trial court's instructions to the jury. He challenges both the court's refusal to give two instructions that he sought and the court's granting of the state's request for an instruction on complicity over his objection.

{¶72} "Requested jury instructions should ordinarily be given if they are correct statements of the law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240. This court reviews a trial court's decision with respect to requested instructions under an abuse-of-discretion standard. *Id.*

{¶73} At trial, White sought a specific instruction cautioning the jury with respect to Sullivan's testimony as a jailhouse informant. The instruction was taken from a federal jury instruction provided in cases involving a cooperating accomplice witness who provides the only evidence connecting the defendant to the alleged crimes. The instruction also incorporates parts of Ohio Jury Instructions, CR Section

409.17, which governs the testimony of an accomplice witness in Ohio. But here, Sullivan was an informant, not a complicitor, and his testimony was not the only evidence that connected White to the crimes alleged in this case. Therefore, the requested instruction was not appropriate. *See State v. Jackson*, 2d Dist. Greene No. 2009CA21, 2010-Ohio-1127, ¶ 15.

{¶74} White also requested that the jury be instructed to consider Harris's testimony with "more caution" than the testimony of the other witnesses because he "may have been influenced by his grant of immunity." But White cites no authority establishing that this is a correct statement of the law. We note that the jury was informed of the grant of immunity by stipulation and that it was free to consider that fact in determining what weight to give Harris's testimony, as instructed by the court.

{¶75} Because White was not entitled to the special instructions that he requested, we find no abuse of the trial court's discretion in denying his requests.

{¶76} Finally, White argues that the trial court erred by giving the complicitor instruction over his objection. According to White, the evidence in this case did not show any complicity by White and only supported an instruction that White acted as a principal offender. *See State v. Wood*, 48 Ohio App.3d 1, 548 N.E.2d 954 (1st Dist.1998). But we cannot say the trial court abused its discretion by instructing the jury on complicity. No witness testified to seeing White shoot Lewis. The state's case against White was circumstantial other than Sullivan's testimony that White told him that he was the triggerman, testimony that was vigorously challenged by White as unbelievable. And Harris testified that someone other than White had the gun when Lewis entered the black Infiniti.

{¶77} Because White has not demonstrated error in the trial court's instructions to the jury, we overrule the fourth assignment of error.

## VI. Prosecutorial-Misconduct Claim

21

{¶78} In his fifth assignment of error, White claims that prosecutorial misconduct during closing argument deprived him of a fair trial. White argues that the prosecuting attorney improperly vouched for the credibility of witnesses and, in so doing, he made an argument not supported by the evidence. White further claims that the prosecuting attorney denigrated defense counsel and improperly shifted the burden of proof.

{¶79} "The test regarding prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights." *State v. Dean*, ____ Ohio St.3d ____, 2015-Ohio-4347, ____ N.E.3d ____, ¶ 238, citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The analysis focuses on the fairness of the proceedings, not the prosecutor's culpability. *Id.* When reviewing a prosecutor's comments in closing argument, we must judge their effect in the context of the entire argument and the entire case. *See State v. Hart*, 94 Ohio App.3d 665, 674, 641 N.E.2d 755 (1st Dist.1994); *State v. Curtis*, 1st Dist. Hamilton No. C-150174, 2016-Ohio-1318, ¶ 13. White did not object to any of the alleged misconduct and has waived all but plain error. *Dean* at ¶ 237.

{¶80} It is improper for the prosecutor to vouch for a witness—to express an opinion or personal belief as to the credibility of that witness by "imply[ing] knowledge of facts outside the record or by plac[ing] the prosecutor's personal credibility in issue." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117, citing *State v. Keene*, 81 Ohio St.3d 646, 666, 693 N.E.2d 246 (1998); *see State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997). But the prosecutor may argue that the other evidence corroborates the witness's testimony, especially when the witness's credibility is attacked. *Jackson* at ¶ 120. And the prosecutor may note that the witness lacked a motive to lie, because the witness was testifying against the self-interest of safety, where the comment is supported by the

record. *See id.* That is what occurred in this case, not improper vouching or improper reference to matters outside of the evidence.

{¶81} The prosecutor must also refrain from denigrating defense counsel. *See Hart* at 674, citing *State v. Keenan*, 66 Ohio St.3d 402, 405-406, 613 N.E.2d 203 (1993). Here, the prosecutor asked the jury to remember the cross-examination and to consider whether there was "any attempt [by the defense] to twist Charles Sullivan in what he said." The prosecutor later stated in reference to Harris's testimony that the defense "put up their little screen of immunity to argue that that is why he is lying." While we do not condone this commentary on the tactics of the defense, considering the argument as a whole, and the failure to object, we do not characterize that isolated commentary as rising to the level of plain error.

{¶82} Finally, White argues that the prosecutor improperly shifted the burden of proof. In the rebuttal portion of closing argument, the prosecutor reiterated to the jurors that the evidence they could rely on was limited to testimony of the witnesses and the admitted exhibits. The prosecutor then stated:

> Why is that important? Because in closing argument defense got up here and showed you a bunch of maps and places and locations of places that there was never a single bit of evidence about, except for document 25, [the GPS log], which gives you an address. If these addresses were so important to their theory of the defense in this case why didn't they ask any questions about it?

Next the prosecutor argued that defense counsel had failed to ask the questions of certain witnesses because the answers would not support the argument the defense wanted to make.

{¶83} Upon our review of these comments, and the context in which they were made, we cannot say that the prosecutor improperly shifted the burden of proof. Just before those comments, the prosecutor reiterated that the state had the "burden to show beyond a reasonable doubt that the defendant committed the[]

crimes." And the comments were directed to defense counsel's argument in closing argument that the state had not met its burden of proof because it had not explained all the information in the GPS records. In commenting on the defense's choice to avoid asking certain questions, the prosecutor merely rebutted defense counsel's argument that the state had failed to meet its burden. This was not improper.

{¶84} Accordingly, we overrule White's fifth assignment of error.

### VII. Conclusion

{¶85} Having overruled each of White's five assignments of error, we affirm the trial court's judgment in all respects.

Judgment affirmed.

**FISCHER, P.J.,** and **HENDON, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.