[Cite as *State v. Noriega*, 2020-Ohio-4201.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                            :

    Plaintiff-Appellee,                        :

                                          No. 18AP-979

v.                                                               :    (C.P.C. No. 17CR-2887)

Carlos M. Noriega,                                  :          (REGULAR CALENDAR)

    Defendant-Appellant.                       :

---

D E C I S I O N

Rendered on August 25, 2020

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton.*

**On brief:** *Timothy Young*, Ohio Public Defender, and *Victoria Bader*, for appellant. **Argued:** *Victoria Bader.*

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Carlos M. Noriega, appeals from the judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to jury verdicts finding him guilty of four counts of heroin possession and four counts of heroin trafficking. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} Noriega and a co-defendant, Michelle Lopez, were indicted on one count of first-degree felony possession of heroin, three counts of second-degree felony possession of heroin, one count of first-degree felony trafficking in heroin, and three counts of second-degree felony trafficking in heroin. The charges arose from drug transactions that occurred

on four separate days in May 2017.[1] A jury trial was conducted on the charges in October 2018.

{¶ 3} Detective Mark Eagan ("Det. Eagan") of the Franklin County Sheriff's Office testified a confidential informant ("informant") provided information about a drug trafficking organization in April 2017.  The informant had previously contacted a specific telephone number ending in 9373 ("the 9373 phone") to arrange the purchase of heroin.  Det. Eagan had the informant contact the 9373 phone to arrange a purchase of one ounce of heroin on May 4, 2017 ("the May 4th transaction").  Det. Eagan monitored while the informant placed the call and arranged the transaction.  The informant was told to meet at a specified location in 45 minutes to complete the transaction.  Det. Eagan, the informant, and a surveillance team went to the specified location.  After Det. Eagan and the informant arrived at the specified location, a gold Nissan Maxima pulled up next to the informant's vehicle.  The informant then received a call from the 9373 phone directing the informant to move to a different location. After driving to the second location, the gold Nissan Maxima once again pulled up.  Lopez exited the gold Nissan Maxima and got into the informant's car.  Det. Eagan gave Lopez $1,300 in exchange for a black ball wrapped in black electrical tape.  During the transaction, Det. Eagan asked whether the weight of the drugs was correct and Lopez  indicated that he did not speak English.  A video recording of the May 4th transaction was played for the jury. Subsequent laboratory testing by the Bureau of Criminal Investigation ("BCI") indicated the item Det. Eagan received during the May 4th transaction was 24.68 grams of a substance containing heroin.

{¶ 4} Later that same day, Det. Eagan placed a call to the 9373 phone to indicate he wanted to buy more drugs in the future.  Det. Eagan testified the person who answered the 9373 phone spoke in broken English, but they were able to communicate.  The informant had previously suggested that the person who answered calls to the 9373 phone might not be the same person who delivered the drugs, indicating that a younger Hispanic male made the deliveries.  After the May 4th transaction, Det. Eagan obtained a court order directing the cellular phone carrier for the 9373 phone to provide "ping" data indicating the physical location of the 9373 phone.  The location data received from the cellular phone

---

[1] Each count of the indictment was accompanied with a specification for forfeiture of money in a drug case pursuant to R.C. 2941.1417. Noriega waived a jury trial on the forfeiture specifications and the parties entered into an agreed entry providing for forfeiture of $23,130 in United States currency.

carrier led Det. Eagan to concentrate his investigation around the area of Red Hill Court in Worthington, Ohio.

{¶ 5}   Det. Eagan subsequently contacted the 9373 phone by text and voice call to arrange another drug purchase for May 9, 2017 ("the May 9th transaction").  Det. Eagan testified that the person who answered the 9373 phone had the same voice as the person who answered on May 4, 2017.  A surveillance team was located near Red Hill Court at the time Det. Eagan made contact.  The user of the 9373 phone again provided a specific location and directed Det. Eagan to be there in 45 minutes.  Det. Eagan arrived at the location first, then contacted the 9373 phone and asked where the delivery was.  The gold Nissan Maxima arrived shortly thereafter.  Det. Eagan got into the Maxima, which was driven by Lopez, and gave Lopez $1,200 in exchange for a black ball wrapped in black electrical tape. A video recording of the May 9th transaction was played for the jury.  In the recording, before the delivery arrived, the individual on the 9373 phone could be heard saying "[h]e was up front too, but he can't see you."  (Tr. Vol. II at 69.)  Subsequent laboratory testing by  BCI indicated the item Det. Eagan received during the May 9th transaction was 24.70 grams of a substance containing heroin.

{¶ 6}   After the May 9th transaction, Det. Eagan and other members of his unit conducted surveillance of the Red Hill Court address where they believed the holder of the 9373 phone lived.  On the evening of May 9, 2017, the ping data for the 9373 phone indicated it was in a vehicle near the Red Hill Court address.  Det. Eagan testified that around 11:00 p.m., Noriega arrived at the Red Hill Court residence in a silver Mitsubishi Galant, parked in front of the residence, and went inside.  The gold Nissan Maxima driven by Lopez to the May 4th and May 9th transactions was also parked near the Red Hill Court address.  Det. Eagan subsequently obtained warrants to place global positioning system ("GPS") tracking devices on both vehicles.

{¶ 7}   The silver Mitsubishi Galant was stopped for a traffic violation by a member of Det. Eagan's unit on May 16, 2017.  Alfonzo Duran was driving the Galant and Noriega was in the passenger seat.  The ping data from the 9373 phone at the time of the traffic stop indicated the phone was in the immediate area of the vehicle, but it was unclear whether Duran or Noriega was in possession of it.

{¶ 8} On May 17, 2017, Det. Eagan again contacted the 9373 phone and requested one ounce of heroin ("the May 17th transaction"). The holder of the 9373 phone directed Det. Eagan to meet in 45 minutes at the same location as the May 4th transaction. After Det. Eagan arrived at that location, the gold Nissan Maxima arrived. Det. Eagan got into the Maxima, which was driven by Lopez, and gave Lopez $1,200 for two small balls wrapped in black tape. While Det. Eagan was in the Maxima, Lopez placed a call to another person on speakerphone; Det. Eagan was able to hear that individual's voice and believed it was the same as the person who answered the 9373 phone. A video of the May 17th transaction was played for the jury. Subsequent laboratory testing by BCI indicated the item Det. Eagan received during the May 17th transaction was 25.45 grams of a substance containing heroin.

{¶ 9} Later in the day on May 17, 2017, Det. Eagan conducted surveillance on Noriega in the silver Mitsubishi Galant in an attempt to observe him using the 9373 phone. Det. Eagan and others followed Noriega to a shopping center. As Noriega exited a store, Det. Eagan placed a call to the 9373 phone. Det. Eagan, who was in a parked car approximately 15 yards away, observed Noriega answer a cell phone, and the two men had a conversation. On cross-examination, Det. Eagan testified there were no photographs or videos of Noriega answering the phone because the surveillance team was stuck in traffic at the time and unable to reach the shopping center.

{¶ 10} On May 18, 2017, Det. Eagan contacted the 9373 phone and requested to purchase 10 ounces of heroin ("the May 18th transaction"). Noriega was under surveillance at the time inside a restaurant. Det. Eagan testified that during the conversation the individual who answered the 9373 phone had a coughing fit. Detective Jacob Smith ("Det. Smith") of the Franklin County Sheriff's Office, who was in the restaurant observing Noriega, testified he saw Noriega speaking on a phone and coughing excessively at the time Det. Eagan called the 9373 phone. A video of Noriega in the restaurant taken by Det. Smith was played for the jury.

{¶ 11} During the phone call, the holder of the 9373 phone directed Det. Eagan to meet at a specified location in 45 minutes. Det. Eagan arrived at the specified location and then the gold Nissan Maxima arrived. Det. Eagan contacted the 9373 phone and the holder of the phone directed him to follow the gold Nissan Maxima to a second location. After

arriving at the second location, Det. Eagan got into the Maxima and asked about the drugs. When Lopez held up two packages, Det. Eagan indicated he need to go back to his car to get the money. Other members of the investigative team then moved in and arrested Lopez. At the time of arrest, Lopez was in possession of a white Samsung cellular phone. Subsequent laboratory testing by BCI indicated packages possessed by Lopez during the May 18th transaction contained 247.20 grams of a substance containing heroin.

{¶ 12} During the May 18th transaction, both Noriega and Duran were in the area, with Noriega driving the silver Mitsubishi Galant and Duran driving a red pickup truck. When Lopez was arrested, Noriega and Duran fled the area. Noriega was subsequently arrested as part of a traffic stop by a marked police cruiser. Duran returned to the Red Hill Court residence and was arrested by officers serving a search warrant. No drugs were discovered during the search of the Red Hill Court residence, but $20,000 was recovered from an ottoman located in the living room.

{¶ 13} Prior to the May 4th, May 9th, and May 17th transactions, Det. Eagan photographed the serial numbers on the buy money for tracking purposes. Some of the bills given to Lopez during those transactions were recovered from the Red Hill Court residence pursuant to a search warrant; other bills given to Lopez during the transactions were in Noriega's possession when he was arrested. Noriega was also in possession of the 9373 phone at the time he was arrested. On cross-examination, Det. Eagan admitted he never met with Noriega personally and never gave Noriega money or received drugs directly from him.

{¶ 14} Det. Smith testified he reviewed records recovered from the phones possessed by Noriega, Lopez, and Duran when they were arrested. He found contacts between Noriega's phone and Det. Eagan's phone number, but no contacts with Det. Eagan's phone number from Lopez or Duran's phones. Det. Smith also testified about activity between Noriega, Lopez, and Duran's phones on the days when the drug transactions occurred. Det. Smith testified that in his experience investigating drug trafficking organizations, it was typical to have layers within the organization and that the individual who delivered drugs to a sale location was not necessarily the person who negotiated the price.

{¶ 15} Lopez testified he had pled guilty to four counts of trafficking in heroin and agreed to testify against Noriega, in exchange for a recommended prison sentence of seven years. Lopez stated he came to Columbus, Ohio, in March 2017 to live with Noriega, who was the cousin of a friend. Noriega helped Lopez obtain a landscaping job. . Lopez stopped working in landscaping after about a month and began delivering drugs for Noriega. Lopez testified Noriega asked him to take over performing drug deliveries and that a man named Alex Hernandez showed him how to make the deliveries.

{¶ 16} Lopez testified Noriega paid for the residence at Red Hill Court and loaned Lopez the gold Nissan Maxima he drove to complete deliveries. Lopez did not pay rent while living at the Red Hill Court residence. Lopez further testified that Duran paid for the cell phone he used. Lopez claimed Noriega was his roommate and friend, but denied Noriega was his boss.

{¶ 17} Lopez testified the May 4th transaction was the first time he had delivered drugs. Duran gave Lopez the heroin to be delivered for the May 4th transaction, and each of the subsequent transactions with Det. Eagan. Lopez testified he was not aware of drugs being kept at the Red Hill Court residence; instead, he would be told where to meet Duran to pick up drugs to be delivered. Lopez could not remember whether Duran or Noriega provided the location for the May 4th transaction, but testified Noriega provided the location for the other three transactions. Lopez testified he would have to report to Noriega before and after each delivery, and that he was on the phone with Noriega during each of the four transactions with Det. Eagan. After the deliveries, Lopez would hand over the purchase money to Noriega or Duran. Lopez testified Noriega twice paid him $500 for making the deliveries.

{¶ 18} Lopez initially denied knowing anyone named Carlos when he was interviewed after being arrested. On direct examination, Lopez admitted he had previously been convicted of drug trafficking in Las Vegas, Nevada, when cocaine was found during a traffic stop while he was driving a car borrowed from a friend. On cross-examination, however, a copy of Lopez's criminal record was introduced, establishing that the drugs found during the traffic stop were heroin, and that Lopez had additional prior convictions for possession of a hypodermic needle and possession of marijuana.

{¶ 19} The jury found Noriega guilty of the heroin possession and trafficking charges as set forth in the indictment. A sentencing hearing was conducted on November 19, 2018. The trial court found the possession and trafficking charges related to each transaction merged for purposes of sentencing, and the State of Ohio, plaintiff-appellee, elected sentencing on the four heroin trafficking counts. The trial court imposed a total sentence of 26 years imprisonment. The court also imposed a mandatory fine of $20,000 as to the first-degree felony heroin trafficking count. The court notified Noriega he would be subject to 5 years mandatory post-release control upon release.

## II. Assignments of Error

{¶ 20} Noriega appeals and assigns the following four assignments of error for our review:

> I. The trial court erred when it failed to conduct individual voir dire to determine whether a juror's expressed safety concerns affected her ability to fairly and impartially consider the case.
>
> II. Carlos Noriega's convictions were against the manifest weight of the evidence.
>
> III. The trial court erred when it sentenced Carlos Noriega to 26 years in prison, because the sentence imposes an unnecessary burden on state government resources.
>
> IV. Carlos Noriega received ineffective assistance of counsel when counsel failed to file an affidavit of indigency on Mr. Noriega's behalf, or otherwise advocate against financial sanctions.

## III. Analysis

## A. Juror bias

{¶ 21} Noriega argues in his first assignment of error the trial court erred by failing to conduct an individual examination of a juror who expressed safety concerns during the trial to determine whether the juror would be able to fairly and impartially consider the case. Noriega claims that proceeding with trial without individually examining the juror violated his right to a fair and impartial jury.

{¶ 22} The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused has the right to trial by an impartial jury. The Sixth Amendment applies to the states under the Fourteenth Amendment to the United States

Constitution. *State v. D.H.*, 169 Ohio App.3d 798, 2006-Ohio-6953, ¶ 49 (10th Dist.). Article I, Section 10 of the Ohio Constitution similarly provides that a criminal defendant is entitled to "a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." The right to be tried by a fair and impartial jury is a fundamental element of our criminal justice system. *See State v. Williams*, 75 Ohio App.3d 102, 109 (10th Dist.1991) ("The right to be tried by a fair and impartial jury of one's peers is a fundamental right guaranteed a criminal defendant under the Sixth Amendment to the United States Constitution.").

{¶ 23} In this case, on the first day of trial after Det. Eagan's direct testimony was completed, one of the jurors advised a member of the court staff that she was apprehensive about her personal safety because she lived in the neighborhood near Red Hill Court and went to one of the commercial locations where some of the drug transactions occurred. The juror asked whether Noriega was in custody and whether she was in jeopardy of encountering someone affiliated with the case while in her neighborhood. Outside the presence of the jury, the trial court asked counsel for feedback on how to respond to the juror's concerns. Noriega's trial counsel responded: "Your Honor, I'm very opposed to any mention of Mr. Noriega being in custody at this point. In fact, the reservations that are discussed after the presentation of one witness causes me concern regarding her ability to be fair and impartial in this particular matter." (Tr. Vol. II at 164.) The trial court and counsel then engaged in an off-the-record discussion. When the matter resumed on the record, Noriega's trial counsel stated: "Your Honor, I don't have any additional suggestions. But I'm still concerned about her ability to be fair and impartial in hearing the full amount of the case, given the comments that have been made." (Tr. Vol. II at 165.) After further discussion, the trial court proposed giving a cautionary statement to the full jury and asked whether that would be acceptable to Noriega:

> The Court: What I propose to do is to tell all the jurors that there has been an inquiry about personal safety. We get it sometimes in serious trials. We have not had any incidents with juror safety. They should feel free to call 911 if there is any issue that they suspect. But otherwise, rely on the fact that in 14 years that I've been a judge, we haven't had any incidents with jurors in my courtroom, and, as far as I know, with the other 16 judges, there hasn't been anything but maybe one. I think some

> years ago Schneider might have had one. I won't identify Judge Schneider. Is that satisfactory to the defense?
>
> [Noriega's trial counsel]: Yes, Your Honor.

(Tr. Vol. II at 167.) After the jury returned to the courtroom, the trial judge made a statement to the full jury consistent with the proposal discussed with counsel.

{¶ 24} Noriega argues on appeal that when a concern regarding juror bias or impartiality arises, a trial court has a duty to conduct a hearing to determine whether the juror can consider the evidence presented fairly and impartially. Noriega claims the trial court erred in this case by failing to individually question the juror who expressed safety concerns to determine whether she could be fair and impartial.

{¶ 25} "Fairness requires impartial, indifferent jurors." *State v. Sheppard*, 84 Ohio St.3d 230, 235 (1998). Generally, a trial court has discretion in determining a juror's ability to be impartial. *Id.*, citing *State v. Williams*, 6 Ohio St.3d 281, 288 (1983). *See also State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 73 ("A trial court has broad discretion in determining a juror's ability to be impartial."). Thus, we typically review a trial court's decision regarding a juror's impartiality for abuse of discretion. An abuse of discretion occurs where a decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). However, the state asserts any error by the trial court in this case was invited because Noriega's trial counsel agreed to the court's proposed instruction to the full jury. "Under the 'invited error' doctrine,[2] a party may not take advantage of an error which he invited or induced." *State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 16. Alternatively, the state argues Noriega waived all but plain error by failing to expressly request the juror be removed or object to continuing the trial with the juror remaining on the panel. Plain error exists when an error is plain or obvious

---

[2] With respect to the state's "invited error" argument, the Supreme Court of Ohio has held that "invited error must be more than mere 'acquiescence in the trial judge's erroneous conclusion.' " *State v. Campbell*, 90 Ohio St.3d 320, 324 (2000), quoting *Carrothers v. Hunter*, 23 Ohio St.2d 99, 103 (1970). The court stated invited error occurs "when a party has asked the court to take some action later claimed to be erroneous, or *affirmatively consented* to a procedure the trial judge proposed." (Emphasis added.) *Campbell* at 324. After setting forth the proposed instruction to be given to the full jury, the trial judge directly asked Noriega's trial counsel whether the instruction was acceptable to the defense. Noriega's trial counsel responded that the proposed instruction was acceptable. Because Noriega's trial counsel affirmatively consented to the trial court's proposed remedy, any error based on the trial court's cautionary instruction to the full jury would constitute invited error.

and affects a substantial right. *Id.* at ¶ 13. The error must constitute an obvious defect in the legal proceedings and there must be a reasonable probability that the error affected the outcome. *State v. Barrie*, 10th Dist. No. 15AP-848, 2016-Ohio-5640, ¶ 32.

{¶ 26} Although Noriega's brief on appeal refers to the trial court's instruction to the full jury as prejudicial, his first assignment of error and argument in support focus on the trial court's failure to individually examine the juror who expressed safety concerns. Based on the record before us, we conclude the plain error standard applies to this assignment of error. Noriega's trial counsel twice generally referred to being concerned about the juror's impartiality, but never directly requested on the record that the trial court individually question the juror to assess her ability to be fair and impartial. Likewise, Noriega's trial counsel did not request the juror be replaced or object to continuing the trial with the juror on the panel. By failing to request an individual examination of the juror or object to continuation of the trial with the juror on the panel, Noriega has waived all but plain error.

{¶ 27} Other appellate courts considering similar claims have held that a juror's expression of safety concerns by itself is not sufficient to demonstrate inability to be fair and impartial. *State v. White*, 1st Dist. No. C-150250, 2016-Ohio-3329, ¶ 32; *State v. Carter*, 7th Dist. No. 05 JE 7, 2007-Ohio-3502, ¶ 17; *State v. Garcia*, 8th Dist. No. 79917, 2002-Ohio-4179, ¶ 86. The defendant must establish that the juror's safety concerns resulted in bias. *Carter* at ¶ 17; *Garcia* at ¶ 86.

{¶ 28} In *White*, following testimony from the defendant's mother, a juror advised the court bailiff that the testimony caused him to be concerned for his safety. The trial judge called the juror into chambers for questioning. The juror stated he believed the defendant's mother lived on a particular street near his residence and that someone in the neighborhood might recognize him as a member of the jury. The trial judge informed the juror that the defendant's mother lived on a different street, and the attorneys noted that the street the juror was concerned about might have been mentioned earlier in the day with respect to GPS evidence or cell phone records. *White* at ¶ 22. After this clarification, the trial judge asked the juror whether the information would affect his ability to be fair and impartial. The juror indicated he was not sure whether he had all the facts straight and that he still had some concerns about retribution, but also stated he was committed to doing his duty. *Id.* at ¶ 24-26. Defense counsel requested the juror be excused. *Id.* at ¶ 27. The trial

court ultimately denied defense counsel's motion to excuse the juror and subsequent motion for mistrial. *Id.* at ¶ 30. On appeal, the First District stated "[a] juror's concern for safety, standing alone, is not sufficient to demonstrate a juror's impairment and warrant a new trial." *Id.* at ¶ 32. The court found the defendant failed to establish an abuse of discretion in retaining the juror because, when questioned, the juror indicated he could return a verdict based on the evidence he heard in the courtroom and would act honestly toward all parties involved. Therefore, the trial court did not abuse its discretion by concluding the juror could be fair and impartial. *Id.* at ¶ 36-37.

{¶ 29} Similarly, in *Carter* the defendant claimed he was prejudiced because one juror discovered during trial he knew one of the defense witnesses and told the other jurors he feared retaliation if they returned a guilty verdict. *Carter* at ¶ 10. The juror advised the trial court during deliberations that he was uncomfortable with the possibility of a guilty verdict because he knew one of the defense witnesses. *Id.* at ¶ 11. The trial judge then questioned the juror, who expressed concerns about retaliation because he recognized several people who were watching the trial. Despite these concerns, the juror indicated he could set his fears aside and decide the case based on the evidence presented. *Id.* at ¶ 13. After the trial court's questioning, the defendant's attorney objected, asserting the jury was no longer competent to render a verdict. *Id.* The trial court denied the objection and the jury proceeded to convict the defendant. On appeal, the Seventh District Court of Appeals held the trial court did not abuse its discretion by denying the defendant's motion for mistrial because the defendant failed to prove any member of the jury was biased due to the juror's safety concerns. The court noted that the particular juror at issue told the trial judge he could decide the case based on the facts presented at trial. Further, the court concluded: "[the juror's] concerns, if they did influence him at all, would have made him more likely to find Carter not guilty, rather than guilty." *Id.* at ¶ 18.

{¶ 30} Finally, in *Garcia*, the jury foreman advised the trial court during jury deliberations that he was concerned for his safety because he worked in the area where the crime occurred and was afraid the defendant's family knew him. *Garcia* at ¶ 86. The foreman sent a note to the trial judge expressing his concerns and requesting he be removed from the jury; the note was signed by three different jurors. A second note was also sent to the trial judge requesting a change in the jury foreman. *Id.* at ¶ 87-89. The trial judge

responded to the first note with written instructions to continue deliberations. *Id.* at ¶ 90. In response to the second note, the trial judge advised the jury in writing it would not interfere with decisions made during deliberations. *Id.* at ¶ 91. The jury then reached a verdict before changing the foreman. *Id.* After the verdicts were rendered, the jurors were polled individually in open court and each juror verbally indicated agreement to each verdict. *Id.* at ¶ 92. On appeal, the defendant alleged the foreman's concerns affected the other jurors and tainted the verdict. *Id* at ¶ 86. The Eighth District Court of Appeals found there was "nothing to indicate that the foreman's or other jurors' concerns about safety tainted their verdict." *Id.* at ¶ 93. The court further noted that "if the foreman's vote was based on his personal concern for safety, then a vote of not guilty would be expected," but the foreman instead voted to convict the defendant. *Id.*

{¶ 31} Unlike *White* and *Carter*, in the present case there was no individual questioning of the juror who expressed concern for her safety. Similar to *Garcia*, however, Noriega fails to demonstrate anything specific in the record to establish the juror's safety concern arising from living in the neighborhood where the events were alleged to have occurred caused her to be biased against him. As the courts in *Carter* and *Garcia* observed, a juror concerned about retaliation would presumably be more likely to vote to acquit, rather than to convict. In this case, all jurors voted to convict Noriega on all counts. Noriega's trial counsel requested the jurors be polled after the verdicts were read, and each juror individually confirmed his or her agreement to the verdicts on all eight counts against Noriega. Thus, we cannot find there to be a reasonable probability that the trial court's failure to individually examine the juror about her safety concerns affected the outcome of the trial.

{¶ 32} In effect, Noriega argues for a per se rule requiring a trial court to conduct an individual examination any time a juror expresses safety concerns. While it may be best practice to individually examine a juror who expresses safety concerns during trial, we are unaware of any precedent requiring a trial judge to do so in every instance and cannot conclude the trial court plainly erred in failing to do so in this case.

{¶ 33} Accordingly, we overrule Noriega's first assignment of error.

**B. Weight of the evidence**

{¶ 34} In his second assignment of error, Noriega claims his convictions were against the manifest weight of the evidence. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*" (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). The court "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 12, citing *Thompkins* at 387. In conducting our review of the evidence, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 35} On appeal, Noriega argues the case against him was based on Det. Eagan's uncorroborated speculation that Noriega was the individual who arranged the four drug transactions via the 9373 phone. Noriega asserts there was no photographic or video evidence of him participating in any of the transactions and no audio recordings of him

participating in phone calls setting up the transactions. Det. Eagan conceded he never gave money to or received drugs from Noriega. Noriega also asserts Lopez was not a credible witness based on his prior criminal history and the fact that he was testifying pursuant to a plea agreement that reduced his prison term.

{¶ 36} Noriega was convicted of four counts of trafficking in heroin, in violation of R.C. 2925.03, which provides in relevant part that no person shall sell or offer to sell a controlled substance or controlled substance analog. He was also convicted of four counts of possession of heroin, in violation of R.C. 2925.11, which provides in relevant part that no person shall knowingly obtain, possess, or use a controlled substance or controlled substance analog. Under the principle of complicity, an individual may be found guilty of an offense if he solicits, aids, abets, or conspires with another individual to commit an offense and shares the criminal intent of the individual who commits the principal offense. *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus.

{¶ 37} Noriega's arguments on appeal challenge the issue of identity, arguing the weight of the evidence failed to establish he was the individual who arranged the drug transactions using the 9373 phone. There was no direct evidence to establish that Noriega was the individual who arranged the drug transactions with Det. Eagan on the 9373 phone, however "[t]he identity of a perpetrator may be established by the use of direct or circumstantial evidence." *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, ¶ 18. "Circumstantial evidence is proof of certain facts and circumstances in a given case, from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind." *State v. Brown*, 10th Dist. No. 15AP-935, 2016-Ohio-7944, ¶ 30. Circumstantial evidence can have the same probative value as direct evidence and a conviction can be sustained based on circumstantial evidence alone. *State v. Franklin*, 62 Ohio St.3d 118, 124 (1991).

{¶ 38} Det. Eagan testified he believed he spoke to the same individual each time he contacted the 9373 phone. In the video recording of the May 9th transaction, the individual on the 9373 phone could be heard saying "[h]e was up front too, but he can't see you," when referring to the delivery driver, suggesting the individual speaking on the 9373 phone was not the delivery driver. Location data from the 9373 phone indicated it was in the area of the Red Hill Court residence around the same time Noriega arrived at the residence on

May 9, 2017. Location data from the 9373 phone also indicated it was located in the silver Mitsubishi Galant on May 16, 2017 when Noriega and Duran were in that vehicle during a traffic stop. Det. Eagan testified he observed Noriega answer a cell phone and had a conversation with Noriega after calling the 9373 phone on May 17, 2017. Similarly, on May 18, 2017, Det. Smith observed Noriega answer a cell phone in a restaurant at the same time Det. Eagan placed a call to the 9373 phone. Det. Smith testified Noriega had a coughing fit while talking on the cell phone, and Det. Eagan testified the individual he spoke with on the 9373 phone coughed excessively during the conversation. Finally, Noriega was in possession of the 9373 phone when he was arrested.

{¶ 39} Forensic examination of the 9373 phone established there were contacts with Det. Eagan's cell phone, as well as extensive contacts between the 9373 phone and Lopez's cell phone. Lopez testified Noriega provided the location to make drug deliveries and paid him for making deliveries. Lopez also testified he was in contact with Noriega during the transactions; this was consistent with Det. Eagan's testimony that he heard Lopez call someone during the May 17th transaction and believed it was the same person he had spoken with on the 9373 phone. With respect to Noriega's argument that Lopez was not a credible witness, the jury was aware of Lopez's plea agreement and prior drug-related criminal history and, therefore, was in the best position to weigh those facts in determining Lopez's credibility. *State v. Jackson*, 10th Dist. No. 14AP-748, 2015-Ohio-5114, ¶ 24.

{¶ 40} Based on our review of the record, weighing the evidence and reasonable inferences arising from that evidence and considering the credibility of the witnesses, we cannot find the jury clearly lost its way and created a manifest miscarriage of justice in convicting Noriega. This is not an exceptional case where the evidence weighs heavily against conviction. Therefore, we conclude the manifest weight of the evidence supported the jury's verdicts.

{¶ 41} Accordingly, we overrule Noriega's second assignment of error.

## C. Excessive sentence

{¶ 42} Noriega argues in his third assignment of error the trial court erred by imposing a 26-year prison sentence. Noriega claims he will be subject to deportation when he is released from prison and, therefore, the sentence imposed by the trial court exceeded

the minimum necessary to punish him without imposing an undue burden on government resources.

{¶ 43} "An appellate court will not reverse a trial court's sentencing decision unless the evidence is clear and convincing that either the record does not support the sentence or that the sentence is contrary to law." *State v. Robinson*, 10th Dist. No. 15AP-910, 2016-Ohio-4638, ¶ 7. In making this determination, "we look to the record to determine whether the sentencing court considered and properly applied the statutory guidelines and whether the sentence is otherwise contrary to law." *State v. Reeves*, 10th Dist. No. 14AP-856, 2015-Ohio-3251, ¶ 4. "[A] sentence is not clearly and convincingly contrary to law when a trial court considers the principles and purposes of sentencing contained in R.C. 2929.11 and the factors listed in R.C. 2929.12, properly imposes postrelease control, and sentences the defendant within the permissible statutory range." *State v. Haddad*, 10th Dist. No. 16AP-459, 2017-Ohio-1290, ¶ 19.

{¶ 44} The purposes of felony sentencing under Ohio law are "to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." R.C. 2929.11(A). The trial court "shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both" in determining how to achieve the purposes of felony sentencing. R.C. 2929.11(A). The court has discretion to select the most effective way to comply with the purposes and principles of sentencing, but in exercising that discretion it must consider the factors set forth in R.C. 2929.12 and may consider any other relevant factors. R.C. 2929.12(A).

{¶ 45} At the sentencing hearing, Noriega's trial counsel asserted Noriega faced deportation once his sentence was completed. He also acknowledged Noriega had previously been deported twice and had illegally entered the United States a third time prior to committing the offenses for which he was being sentenced. Citing a per-day incarceration cost of $67.31, which he asserted was based on a news article, Noriega's trial counsel claimed imposing the minimum sentence of 11 years would cost the state more than $270,000, while a 20-year sentence would cost nearly $500,000. Based on this and other

factors, Noriega's trial counsel requested the court impose the minimum sentence. In response, the prosecutor argued that even if deported at the end of his sentence, Noriega was likely to come back to the United States and engage in drug trafficking again because he had committed similar offenses prior to his earlier deportation. When the trial court imposed a total sentence of 26 years imprisonment, the judge acknowledged there would be substantial costs involved in incarcerating Noriega for that length of time but indicated those costs were appropriate given the court's evaluation of the other sentencing factors.

{¶ 46} While acknowledging that resource conservation is a sentencing consideration, this court has held it must be balanced against the need to protect the public and stated that "[a] sentencing court is not required to elevate consideration of resource burdens over the seriousness and recidivism factors of R.C. 2929.12." *State v. Wilburn*, 10th Dist. No. 17AP-602, 2018-Ohio-1917, ¶ 16. When presented with a similar argument that a long prison term was not necessary to protect the public because the defendant would likely be deported after serving his prison term, the Eleventh District Court of Appeals noted "[the defendant] cites no case law for the proposition that a trial court should weigh the fact that there is a possibility that an offender will be deported after serving a prison term, thus limiting the *possibility* that the individual will commit future offenses in the United States." (Emphasis sic.) *State v. Musa*, 11th Dist. No. 2009-L-023, 2010-Ohio-318, ¶ 16. Similarly, in the context of challenges to the imposition of consecutive sentences, other courts have concluded a trial court need not consider whether a defendant may be subject to deportation after serving a prison term. *State v. Bautista*, 2d Dist. No. 2015-CA-74, 2016-Ohio-5436, ¶ 12 ("Based on the record before us, the trial court certainly could have concluded that consecutive sentences were necessary to protect the public from future crime or to punish Bautista and that consecutive sentences were not disproportionate to the seriousness of his conduct and to the danger he poses to the public. We are unpersuaded that Bautista does not pose a danger to the public because he is likely to be deported upon his release from prison."); *State v. Balbi*, 8th Dist. No. 102321, 2015-Ohio-4075, ¶ 10 ("Balbi next argues that consecutive sentences were unnecessary to protect the public because he will be deported after serving his prison sentence. Assuming the certainty of Balbi's deportation, it is not a valid reason to find that it supersedes the state's interest

in punishing him and that he will not resume his activity elsewhere.  Apart from the self-serving nature of the argument, any deterrence factor in his punishment would be lost.").

{¶ 47} The trial court in this case discussed its reasons for imposing a substantial prison sentence on Noriega at the sentencing hearing.  The transcript of the sentencing hearing and the judgment entry imposing sentence reflect the trial court considered the purposes of sentencing under R.C. 2929.11 and the statutory factors under R.C. 2929.12.  The trial court also made the findings required under R.C. 2929.14(C)(4) to impose consecutive sentences.  Therefore, Noriega has failed to establish that the sentence was clearly and convincingly contrary to law.

{¶ 48} Accordingly, we overrule Noriega's third assignment of error.

## D. Ineffective assistance of counsel

{¶ 49} Noriega argues in his fourth assignment of error that his trial counsel provided ineffective assistance by failing to file an affidavit of indigency or otherwise advocate on his behalf against the imposition of financial sanctions.

{¶ 50} Noriega was sentenced for one first-degree felony heroin trafficking conviction and three second-degree felony heroin trafficking convictions, all in violation of R.C. 2925.03.  Ohio law imposes a mandatory fine for first, second, or third-degree felony violations of any provision of R.C. Chapter 2925.  R.C. 2929.18(B).  The fine may be up to $20,000 for a first-degree felony and up to $15,000 for a second-degree felony.  R.C. 2929.18(A)(3)(a) and (b).  "If an offender alleges in an affidavit filed with the court prior to sentencing that the offender is indigent and unable to pay the mandatory fine and if the court determines the offender is an indigent person and is unable to pay the mandatory fine * * * the court shall not impose the mandatory fine upon the offender."  R.C. 2929.18(B)(1).  Additionally, "[b]efore imposing a financial sanction under section 2929.18 of the Revised Code * * *, the court shall consider the offender's present and future ability to pay the amount of the sanction or fine."  R.C. 2929.19(B)(5).  An offender bears the burden of affirmatively demonstrating he is unable to pay a mandatory fine.  *State v. Loving*, 180 Ohio App.3d 424, 2009-Ohio-15, ¶ 8 (10th Dist.), citing *State v. Gipson*, 80 Ohio St.3d 626, 634 (1998).

{¶ 51} We apply a two-part test to evaluate claims of ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio

St.3d 136, 141-42 (1989). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland* at 687. This court has previously held that "[t]he failure to file an affidavit of indigency prior to sentencing may constitute ineffective assistance of counsel in a case where the record establishes a reasonable probability that the trial court would have found the defendant indigent, thereby relieving him of the obligation to pay a mandatory fine." *State v. Parsley*, 10th Dist. No. 09AP-612, 2010-Ohio-1689, ¶ 65.

{¶ 52} Noriega claims his trial counsel performed deficiently by failing to file an affidavit of indigency prior to the sentencing hearing. He alleges he has no present or future ability to pay the mandatory fine imposed by the court. Noriega asserts he will be 64 years old at the end of his sentence and will likely be deported to Mexico. He claims he worked in landscaping prior to incarceration, but alleges he has suffered an ankle injury that may limit his future mobility. Noriega argues his inability to pay the mandatory fine is also reflected in the affidavit of indigency filed for purposes of retaining appointed counsel.

{¶ 53} This court recently rejected a similar argument asserted by a defendant who was subjected to a mandatory fine pursuant to a heroin trafficking conviction. *State v. Delgadillo-Banuelos*, 10th Dist. No. 18AP-729, 2019-Ohio-4174, ¶ 25-40. In that case, as in the present appeal, the defendant filed an affidavit of indigency for purposes of obtaining appointed counsel but his counsel did not file a separate affidavit prior to sentencing indicating he was unable to pay the mandatory fine. *Delgadillo-Banuelos* at ¶ 27. We noted that an offender's indigency for purposes of receiving appointed counsel was separate and distinct from indigency for purposes of avoiding a mandatory fine and held that an offender may not rely on an affidavit of indigency for purposes of receiving appointed counsel for the purpose of avoiding payment of a mandatory fine. *Id.* The defendant in *Delgadillo-Banuelos* had entered the country illegally from Mexico and engaged in the drug trade. He was 38 years old at the time of the offenses and described his physical health as excellent. He had previous employment experience with auto parts and customer service. He claimed he had no assets and owed money on his water bill, an outstanding bank loan, and his house in Mexico. In addition to the money made in the drug trade, the defendant also received money from his wife, who worked in Mexico. *Id.* at ¶ 30-32. At the sentencing hearing, the trial court stated it had considered the defendant's present and future ability to pay a fine

and financial sanction. The trial court imposed the full potential fine, "in the event that [Delgadillo-Banuelos] has any assets that show up." *Id.* at ¶ 35. On appeal, this court rejected the defendant's claim that his trial counsel performed deficiently by failing to file an affidavit of indigency, holding that because there was evidence the trial court considered his present and future ability to pay mandatory fines and made no determination he was unable to pay those fines, there was no reasonable probability the trial court would have found him to be indigent and relieved the obligation to pay the fines if his trial counsel had filed an affidavit of indigency. *Id.* at ¶ 40.

{¶ 54} Although Noriega's trial counsel did not file an affidavit of indigency prior to sentencing, at the sentencing hearing he requested the trial court waive fines and court costs due to indigency. In a statement to the court, Noriega claimed he was previously jailed in Mexico because he was unable to pay child support and had come to the United States to earn money. However, during trial Lopez testified Noriega paid for the Red Hill Court residence and provided the car Lopez used when making drug deliveries. Because of his four convictions, Noriega was facing a maximum possible fine of $65,000, but the trial court only imposed a fine on the first-degree felony conviction, rather than on all eligible charges. The trial court indicated it felt that only imposing the fine on one conviction was sufficient. In discussing the sentence imposed, the trial court noted the large amount of money recovered from the Red Hill Court residence. When Noriega's trial counsel asked the court to defer imposition of the fine until after his sentence was completed, the court declined, noting that if Noriega had funds to contact his mother in Mexico, he would have funds to pay toward the mandatory fine. The trial court stated "it may be nothing much, but he can start paying back some of the mandatory fine." (Tr. Vol. VI at 18.) The sentencing entry also indicated the court considered Noriega's present and future ability to pay a fine and financial sanction. Thus, in this case, as in *Delgadillo-Banuelos*, the record contains evidence demonstrating the trial court considered Noriega's present and future ability to pay a mandatory fine and made no determination he was unable to pay the fine. Therefore, Noriega fails to demonstrate his trial counsel was ineffective for failing to file an affidavit of indigency seeking to avoid imposition of the mandatory fine, because there is not a reasonable probability the trial court would have found him indigent and declined to impose the fine if such an affidavit had been filed. *See Delgadillo-Banuelos* at ¶ 40.

{¶ 55} Accordingly, we overrule Noriega's fourth assignment of error.

**IV. Conclusion**

{¶ 56} For the foregoing reasons, we overrule Noriega's four assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and NELSON, JJ., concur.

_____