[Cite as *State v. Eastman*, 2022-Ohio-2241.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon. Earle E. Wise, P.J. |
| Plaintiff - Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| JUSTIN EASTMAN, | : | Case No. 21 CAA 05 0024 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Delaware County
Court of Common Pleas, Case No.
19 CR I 0834

JUDGMENT:      Affirmed

DATE OF JUDGMENT:      June 29, 2022

APPEARANCES:

For Plaintiff-Appellee

MELISSA A. SCHIFFEL
Delaware County Prosecuting Attorney
200

By: MARK C. SLEEPER and
CHRISTOPHER E. BALLARD
Assistant Prosecuting Attorneys
145 N. Union Street, 3rd Floor
Delaware, Ohio 43015

For Defendant-Appellant

WILLIAM T. CRAMER
470 Olde Worthington Road, Suite

Westerville, Ohio 43082

*Baldwin, J.*

{¶1} Appellant, Justin L. Eastman, appeals the decisions of the Delaware County Court of Common Pleas denying his motion to suppress statements made to detectives and to another inmate. Eastman also appeals the trial court's denial of his motion for a mistrial. The appellee is the State of Ohio.

## STATEMENT OF THE CASE AND THE FACTS

{¶2} Justin Eastman was charged with the aggravated murder of Donna Harris in violation of R.C. 2903.01(B), convicted and sentenced to a life term without parole. During the trial he did not dispute many of the facts presented by the state, but contended that Harris was alive when he left her at the park on November 20, 2019. She was found at that same park, having died from blunt force trauma to her skull.

{¶3} The parties in this case have offered a detailed recitation of the facts that preceded the death of Donna Harris. The narratives do not diverge from each other with regard to the characterization of the testimony as supporting the conclusion that the appellant, Eastman, was in a relationship with Ashley Quick and with the victim, Donna Harris. Eastman's relationship with Donna Harris was motivated by his desire to obtain some part of the settlement she received for a disability claim and to share what he obtained with Quick. Harris's family did not approve of the relationship, yet that disapproval did not deter her from enjoying Eastman's company. These details, though an important part of the trial, play a peripheral role in the appeal. The Harris/Eastman/Quick relationships serve as a background for the events that are pertinent to the appeal, but are not the focus of the dispute. Instead, the events that

occurred after the death of Harris, which are much more limited, and less convoluted, serve as the basis for the appeal.

{¶4}   Eastman left the state of Ohio after Harris's death creating a trail of purchases using Harris's debit card that were easily tracked.  He was also the subject of a video that showed him selling a cellphone at a kiosk designed to purchase used cellphones.  The state provided evidence that the subject of this transaction was Harris's cellphone.  A warrant was issued for Eastman, and he was subsequently arrested as part of a traffic stop in Kansas.

{¶5}   Detectives from the Delaware County Sheriff's Office visited Eastman in the Kansas prison with the goal of talking with him about the case.   They introduced themselves and Eastman responded by telling them that "[o]nce I talk to a lawyer I will tell you everything I've ever done in my entire life* * *" (Suppression Hearing, Exhibit 1, Audio Recording 191126_0192.MP3 at 8:37)[1].  The detectives asked if he had an attorney and offered to put him in contact with an attorney.  He referenced an attorney that he knew in Ohio and the detectives made arrangements for him to call that attorney on a private line.

{¶6}   After the call, Eastman reported that the attorney was not able to make time for his case.  The detectives offered to contact a different attorney, but Eastman declined and stated that he would wait until he returned to Ohio.  Then, without prompting, he explained that he wanted to talk with an attorney because he was concerned that Ashley Quick was wrongly charged.  The conversation continued and became a bartering

---

[1] The Exhibit contains contemporaneously recorded audio and video of the encounter between Eastman and the detectives.  However, this portion of the conversation is only on the audio.  Further, just prior to this comment Eastman makes a remark about talking with an attorney, but his words are not clearly reproduced by the recording.

session where Eastman contended that he was responsible for several unsolved crimes including a murder, and that he was willing to confess to "everything" if Ashley Quick was exonerated. Eastman spoke freely, openly and confidently. The detectives stopped Eastman, reviewed his rights and he agreed that he understood his rights and continued to actively engage in conversation with the detectives urging them to agree to exchange his comprehensive confession for Quick's freedom. One of the detectives agreed to contact the prosecutor, but it is evident from the record that the parties did not reach an agreement.

{¶7} Eastman moved to suppress the statements he made to the detectives. At a hearing on the motion, the detectives testified regarding the encounter with Eastman and the state submitted video and audio recordings of the meeting with Eastman as exhibits. The trial court denied the motion, holding:

> * * * that the Defendant was not subject to custodial interrogation prior to his
> receipt of Miranda warnings, that he did not unambiguously invoke his right
> to counsel, and that after he received Miranda warnings, he waived his right
> to counsel and his right to remain silent after confirming that he understood
> his rights. No constitutional error occurred during Defendant's interview with
> Detectives Leonard and Cannon.

Judgment Entry Denying Defendant's Motion to Suppress, Sept. 1, 2020, p. 17.

{¶8} Eastman also moved to suppress statements made to an inmate housed with him while he was awaiting trial.

{¶9} When Eastman was extradited to Ohio he was incarcerated pending trial and housed with another inmate, William Popich, in what appeared to be the medical wing

of the prison.  Eastman and Popich were the only inmates in this section and they often talked.  Eastman began talking about his relationship with Harris and the events leading to her death, and Popich listened.  He had prior experience using information that he had obtained from other cellmates to reduce his sentence, and he saw his relationship with Eastman as an opportunity to do the same with his current charges.

{¶10}  Popich contacted detectives at the Delaware County Sheriff's Office and explained that Eastman was making comments that suggested he was responsible for the death of Donna Harris.  The detective told Popich to listen and emphasized that he should not ask any questions of Eastman.  Popich and his counsel executed a memorandum of understanding regarding any benefit that Popich might receive for his cooperation that stated, among other things, that "[i]n exchange for performance of all of the above, the State of Ohio will inform the sentencing judge in Case No. 20 CR I 070441 of William Popich's performance of this agreement so that the judge can take into account in fashioning his sentence. Nothing in this agreement will change the State's recommendation of a prison sentence being imposed in that case." (Trial Transcript, Vol. VI, p. 1375, lines 4-11).  Popich confirmed that he understood that the only benefit he received from his cooperation was a report to the trial judge that he complied with the agreement and that the state recommend a prison sentence, but would defer to the judge regarding the length of any sentence.

{¶11} Eastman sought to have the testimony of Popich excluded from the trial arguing that Popich was an agent of the state that intentionally elicited a confession from Eastman in violation of his Sixth Amendment right to counsel.  After a hearing on the matter, where only Popich testified, the trial court denied the motion finding that:

I don't think that there's been a deliberate elucidation. Obviously, the purpose of the Sixth Amendment is to avoid uncounseled interrogation. And if somebody is sitting there just listening, there is no interrogation, even if the person is an agent of the State. So it doesn't appear so in this case that the person is an agent of the State, and there doesn't appear to be any interrogation based on testimony. So the Court will deny the motion to exclude the testimony.

Trial Transcript, Vol. 1, p. 27, lines 11-20.

{¶12} At trial, Popich confirmed that he had no access to the facts of Eastman's case and testified that Eastman had confessed to the murder of Donna Harris:

* * the first evening he told me basically about where the body was found. It was in a lot near a pond. He said that he had taken a debit card, gone to Lowe's, used a debit card at Lowe's. Bought a ten piece DeWalt set, at which time he immediately went to return it so he could turn it into cash. Said he also did the same thing at Home Depot. And then said that he got a rental van and left town. (Trial Transcript, Vol. VI, p. 1379, lines 11-19).

* *

But then the day after that, on the 27th, he started speaking again. And that was when he told me that he had killed her and that he had left the body in the area. He had come back at one point in time to cover it up. And then that was -- In a nutshell, that was it. (Trial Transcript, Vol. VI, p. 1379, lines 23 to p. 1379, lines 1-3).

* *

At one point he said he picked her up by her neck and choked her and struck her on the head, and then at another point he just said that had that killed her. (Trial Transcript, Vol. VI, p. 1381, lines 9-12).

**{¶13}** The state also offered the testimony of over twenty additional witnesses who provided significant evidence that supported a conclusion that Eastman was involved in Harris's death:

- Harris was supposed to have a date with Eastman the evening she was murdered. (Trial Tr. Vol. II, 411).

- Surveillance video showed Harris in a vehicle with Eastman on the night she was murdered. She wore the same top as she was wearing at her death. (Trial Tr. Vol. II, 491 - 500, State's Exhibits 5,6,7,8).

- Eastman asked Natasha Gowers-Sanders if she had a Cash App account and she later received a $480 deposit from Harris's account and Eastman asked if she has received the transfer. (Trial Tr. IV, 879 -881).

- DNA consistent with Eastman's profile was found on one of the concrete blocks on the blanket where Harris's body was located and in Harris's rental car. (Trial. Tr. Vol. IV 919 - 940).

- Surveillance video showing Eastman, in the same Pink Floyd sweatshirt he was seen in the earlier surveillance video with Harris, selling her cell phone at 11:09 a.m. on November 21, 2019. (Trial Tr. Vol. V, 1001-1006, State's Ex. 129-130).

- Surveillance video showing Eastman making purchases with Harris's debit card from November 22 to November 25. (Trial Tr. Vol. V, 1016 - 1030, 1047).

- The Pink Floyd sweatshirt that Eastman had worn in the surveillance videos was in the van that he was driving when he was arrested. (Trial Tr. Vol. V, 1071 - 1072, 1075).

- Property purchased with Harris's debit card was in the van Eastman was driving when he was arrested. (Trial Tr. Vol. V, 1074 -1084, 1104, State's Ex. 163, State's Ex. 142 - 160).

- Text message exchanges between Quick and Eastman confirming that he was with Harris and, later, that still he was "still out waiting on the sun to come up so I can find this phone because it's the only thing that can link me to this." (Trial Tr. Vol. VI, 1467).

- The location data on the cell phones supported a conclusion that Eastman and Harris spent the night of November 19 together. (Trial Tr. Vol. VI, 1468).

- Eastman texted Quick that "I'm having to hike back and check the clothes for the debit cards not in the wallet. I will find them and be back." (Trial Tr. Vol. VI, 1469).

- Eastman texted Quick that he thought the cards "would be in her wallet" but that instead he had to "go back and dig up the clothes" to retrieve the cards. (Trial Tr. Vol. VI, 1474-1475).

- Easton texted Quick that he "had to do some straight animal shit, and I don't have to go back and see it again to find the cards." (Trial Tr. Vol. VI, 1476).

- Eastman texted Quick that that he only has the "cash in her wallet" but he got the "phone with the Cash App" but that he "didn't check the clothes. I was sick." (Trial Tr. Vol. VI, 1476).

{¶14} Eastman testified on his own behalf and admitted that he appeared in the surveillance videos and exchanged texts with Quick. He claimed that he and Harris were at the location where her body was found on November 20 when she told him to talk to Quick regarding his relationship with Quick. He claims he drove away with Harris's phone and eventually drove off to Kansas where he was arrested and first discovered that Harris was dead.

{¶15} As for the text messages, Eastman provided an alternate explanation for each text to rebut the implication that he was involved in the murder of Harris.

{¶16} The matter was submitted to the jury and Eastman was convicted of Aggravated Murder and sentenced to life without the possibility of parole. Eastman filed a timely appeal and submitted three assignments of error:

{¶17} "I. APPELLANT'S RIGHT TO COUNSEL UNDER THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION WAS VIOLATED BY TESTIMONY FROM A JAILHOUSE INFORMANT."

{¶18} "II. APPELLANT'S RIGHT TO REMAIN SILENT AND RIGHT TO COUNSEL UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE U.S. CONSTITUTION WERE VIOLATED BY STATEMENTS MADE DURING CUSTODIAL INTERROGATION. "

{¶19} "III. APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL UNDER THE STATE AND FEDERAL CONSTITUTIONS WAS VIOLATED BY THE TRIAL

COURT'S REFUSAL TO GRANT A MISTRIAL FOLLOWING THE DISCOVERY OF A VICTIM MEMORIAL AT THE SITE OF A JURY VIEW."

**STANDARD OF REVIEW**

**{¶20}** Eastman's first two assignments of error argue the court erred by failing to suppress the testimony of Popich and the testimony of the detectives regarding statements made by Eastman. Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. The trial court is the finder of fact in evaluating a motion to suppress; therefore, it is in the best position to resolve factual questions and evaluate the credibility of witnesses. *Id.* The trial court's findings of fact must be accepted by an appellate court if they are supported by competent, credible evidence. *Id.* "Accepting facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.* That is, the appellate court will review the application of the legal standard to the facts de novo. *Id.*

**{¶21}** There are three methods of challenging a trial court's ruling on a motion to suppress on appeal. *State v. Goins*, 5th Dist. Morgan No. 05-8, 2006-Ohio-74, ¶ 10. First, an appellant may challenge the trial court's finding of fact. *Id.* Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. *Id.* Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. *Id.* When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist. 1994).

**{¶22}** In his third assignment of error, Eastman contends the trial court erred by failing to grant a mistrial. The granting of a mistrial rests within the sound discretion of the trial court as it is in the best position to determine whether the situation at hand warrants such action. *State v. Glover*, 35 Ohio St.3d 18, 517 N.E.2d 900 (1988); *State v. Jones*, 115 Ohio App.3d 204, 207, 684 N.E.2d 1304, 1306 (7th Dist.1996) as quoted in *State v. Crank,* 5th Dist. Stark No. 2014CA00175, 2015-Ohio-1909, ¶¶ 66-70.

**ANALYSIS**

I.

**{¶23}** Eastman claims that his right to counsel under the Sixth Amendment to the U.S. Constitution was violated by testimony from a jailhouse informant. Specifically, Eastman claims that the acts of another inmate, Popich, were tantamount to acts of the state and an illegal interrogation that warranted exclusion of any of the statements Popich attributed to Eastman.

**{¶24}** Eastman contends that "Popich deliberately engaged Eastman in conversations about his case for the purpose of eliciting incriminating remarks" (Appellant's Brief, p. 26) but does not cite to any portion of Popich's testimony to support that assertion. Popich vehemently denies asking questions about the case during questioning by defense counsel:

Q. The detective told you to, quote, keep doing what you're doing. What did

that mean to you?

A. Just listen.

Q. Okay. Did you ever ask Eastman a single question?

A. About his case?

Q. Yeah.

A. No. No.

Q. So when he was talking, at no point in time did you ask him any questions about anything?

A. No. To me that would be too suspicious.

Q. So even during the course of the conversation as he's talking about things, did you say, "Well, what did you do then?"

A. Not that I can recall, no.

Transcript, Vol. I, p. 29, line 25 to p. 30, lines 1-10.

**{¶25}** During trial Popich explained that if someone wanted to talk about their case, asking questions could be dangerous: "You don't want to look like you're prying. If someone wants to volunteer information, you'll listen. They'll volunteer. You let them speak. But to ask questions, to pry, usually creates fights, creates tension, creates problems." (Trial Transcript, Vol. VI, p. 1367, line 24 to p. 1368, line 3).

**{¶26}** Popich did admit that he asked "a couple questions as far as what was -- in general with his case, but nothing specific" but he explained that "With Mr. Eastman, he was giving it up; so I didn't need to ask questions." (Transcript, Vol. I, p. 34, lines 4-5, lines 9-11). Popich confirmed that he was told to listen and not asked questions. (Transcript, Vol. I, p.30, line 2; p. 34, lines 18-21; p. 39, lines 8-21; p. 40, lines 12-16).

**{¶27}** We have held that "[i]ncriminating statements concerning pending charges are inadmissible at trial if the state, in obtaining the evidence, knowingly circumvents the right of an accused to have counsel present in a confrontation between the accused and

a state agent." *Maine v. Moulton* (1985), 474 U.S. 159, 171, 106 S.Ct. 477, 88 L.Ed.2d 481 as quoted in *State v. Franz*, 5th Dist. Knox No. 04CA000013, 2005-Ohio-1755, ¶ 33.

{¶28} "[W]hether someone is acting as an agent of law enforcement is dependent upon the unique circumstances of each case. *State v. Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, 116 N.E.3d 1240 quoting *State v. Bernard*, 31 So.3d 1025, 1033 (La.2010). The court in *Bernard* provides a useful analysis of the characteristics of a state agent and summarizes the analysis by focusing on: "whether the investigator discussed the case with police prior to the interview, whether the interview was conducted at the police's request, and whether the primary purpose of the investigator's visit was to elicit a confession while in cahoots with law enforcement. In short, police may not circumvent Miranda by using OCS investigators (or anyone else) as stand-ins to conduct interrogations in their stead." *Bernard* at p. 1035. The record before us shows that Popich did not discuss the case with the police prior to talking with Eastman, that his conversations with Eastman was not conducted at the request of the officers, and that Popich did not take any steps to elicit a confession from Eastman.

{¶29} The record before us lacks evidence that would allow us to conclude that Popich was a state agent. Eastman has pointed to no evidence that Popich "acted at the direction, control, or behest of law enforcement." *Woods v. Warden, Warren Correctional Institution,* S.D.Ohio No. 1:20-CV-618, 2021 WL 698505, *5, supplemented, S.D.Ohio No. 1:20-CV-6182021 WL 1238109.

{¶30} Eastman's confession, if deliberately elicited in these circumstances, may have supported Eastman's argument. *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). But Popich made it clear that he did not ask

any questions, and the only instruction that he received from the officer was to listen and not ask questions. Eastman presented no evidence that the officers requested that Popich take any action or that they knew that Popich and Eastman had arranged a meeting for the express purpose of discussing the charges against Eastman. *Maine v. Moulton,* 474 U.S. 159, 176–77, 106 S.Ct. 477, 487–88, 88 L.Ed.2d 481 (1985). Popich was not "* * * [a] paid informant for the government act[ing] under instructions from the government* * * " *State v. Barnett,* 67 Ohio App.3d 760, 770, 588 N.E.2d 887, 893–94 (4th Dist.1990). And, while Popich was motivated by his perception that his actions may benefit him, the "fact that an informant desired favorable treatment in return for his testimony does not, standing alone, demonstrate the existence of an implied agreement." *Bell v. Bell*, 512 F.3d 223, 233-234 (6th Cir.2008) as quoted in *State v. Ford,* 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616.

{¶31} We have reviewed the record and find that Popich was not only not a paid agent of the state, but he also did not conduct an interrogation, or take an action that could be interpreted as an invitation or coercion to discuss charges against Eastman. Instead the evidence demonstrated that Popich engaged in a "casual, spontaneous conversation" with Eastman and shared information with the police. *State v. Ward*, 10th Dist. Franklin No. 74AP-143, 1974 WL 184456, *3–4; *State v. White,* 1st Dist. Hamilton No. C-150250, 2016-Ohio-3329, ¶ 66. There is no evidence that Popich was set on his course by law enforcement officers. *State v. Willison,* 2nd Dist. Miami No. 89-CA-18, 1990 WL 56858, *4. Instead, Popich brought information to the officers and the only direction he received was to listen and not ask questions, and the record confirms that he complied with those instructions.

Eastman "* * * volunteered the information to the informant. In such cases, "a defendant does not make out a violation of [the Sixth Amendment] right [to counsel] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson (*1986), 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364; cf. **1178 *United States v. Henry (*1980), 447 U.S. 264, 271, 100 S.Ct. 2183, 65 L.Ed.2d 115 (right to counsel violated where informant "was not a passive listener" but took "affirmative steps to secure incriminating information").

*State v. Johnson,* 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶¶ 235-237.

**{¶32}** We reach the same conclusion as the Supreme Court of Ohio in *Johnson* and find that "[b]ecause the record does not reveal that [Popich] did anything but listen to what [Eastman] volunteered to him, the trial court did not err in denying [Eastman's] suppression motion." *Id.* at 237. Eastman's first assignment of error is overruled.

## II.

**{¶33}** In his second assignment of error, Eastman complains that his right to remain silent and his right to counsel were violated by the admission of statements he made during custodial interrogation. He claims that despite his statement that "he would only talk to the detectives once he was returned to Ohio and could talk to a lawyer" the detectives continued "interrogating him to get him to change his mind by repeatedly

reminding him of the evidence they had against him and asking him to help himself by giving his side of the story." (Appellant's Brief, pages 33-34).

**{¶34}** Eastman moved to have the statements made at the Kansas jail suppressed and the matter was heard by the court. The two detectives who had participated in the meeting with Eastman testified and the audio and video recording of the meeting was admitted into evidence without objection.

**{¶35}** The trial court issued a lengthy entry analyzing the testimony and the exhibits. After considering all of the evidence, the trial court concluded that:

> [t]he Defendant's repeated statement of his intention to obtain counsel at some future time in some other place did not cumulatively amount to an unambiguous demand for counsel. He did not ask for a lawyer, although he was offered one. And when the detectives offered for a second time—to obtain counsel for the Defendant after his first attempt to secure counsel failed, the Defendant waived off their offer and disclosed his true intention was not to obtain counsel to consult about this case but rather to have someone to negotiate the freedom of his co-defendant. Despite ample opportunity, the Defendant never unambiguously invoked his right to counsel.

Judgment Entry Denying Defendant's Motion to Suppress, Sept. 1, 2020, p. 16.

**{¶36}** During his meeting with the detectives, Eastman made several references to speaking to attorney, but never unambiguously stated that he would not talk with the detectives without an attorney. Instead, he explained that "Once I talk to a lawyer I will tell you everything I've ever done in my entire life* * *" (Suppression Hearing, Exhibit 1,

Audio Recording 191126_0192.MP3 at 8:37) Less than a minute later he states "I'll tell you guys everything that I've ever done in my life, but not until I talk to an attorney." (Audio Recording, (Suppression Hearing, Exhibit 1, Audio Recording 191126_0192.MP3 at 9:20).  He makes similar statements in the next few minutes:

{¶37}  1. Easton states, "the minute I talk to a lawyer." The detective invites him to contact her when he talks an attorney and asked if he is already retained counsel. He states no. (Suppression Hearing, Exhibit 1,  Video Recording Room 1_11-26-2019_47105 at 13:05:59).[2]

{¶38}  2. Easton states "Once I talk to a lawyer I will clarify everything, we can go there through every single message and tell you what it was about." (Suppression Hearing, Exhibit 1,  Video Recording Room 1_11-26-2019_47105 at 13:06:39).

{¶39}  3. Eastman states "I will tell you everything that I know about anything that I've ever done in my entire life we can just put it all out there once I talk to a lawyer." (Suppression Hearing, Exhibit 1,   Video Recording Room 1_11-26-2019_47105 at 13:07:09).

{¶40}  4. A Detective hands him a business card and mentions "if you're getting an attorney" to which Easton replies "I literally just want to ask him a couple questions and once I speak to an attorney, any attorney and ask him a couple questions then I'm ready to put it all out there, you know what I mean." The detective offers to contact his attorney in Ohio so he may talk with him. Eastman contacts an Ohio attorney's office but reports

---

[2] The time reference for the video is taken from the timer that appears in the upper left corner of the video.

that they declined to accept this case. (Suppression Hearing, Exhibit 1,  Video Recording Room 1_11-26-2019_47105 at 13:08:25).

**{¶41}** 5. In the second video a detective asked if Eastman would like her to attempt to find him another attorney before they go and he responds that "I would much rather just talk in Ohio nothing's going to change between here and there. I'm going to tell you guys everything that I said I'm going to tell you. Here's why I want to speak to a lawyer just being completely honest. I believe you guys are going to end up trying to charge Ashley and she really had nothing * * *  those conversations have absolutely nothing to do with what you guys are charging me with. (Suppression Hearing, Exhibit 1,  Video Recording Room 1_11-26-2019_47809 at 13:07:02).

**{¶42}** Eastman's motivation to disclose his responsibility for multiple offenses becomes clear in the second recording when he makes statements such as "I'm willing to tell you guys everything but it's going to be at the cost that her charges disappear." (Suppression Hearing, Exhibit 1,   Video Recording Room 1_11-26-2019_47809 at 13:07:47).

**{¶43}** Police investigators must honor an invocation of the right to cut off questioning only if such invocation is unambiguous.  *State v. Murphy* (2001), 91 Ohio St.3d 516, 520, 747 N.E.2d 765, citing *Davis v. United States* (1994), 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362. A defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate an interrogation in progress. *People v. Silva* (1988) 45 Cal.3d 604, 629–630, 247 Cal.Rptr. 573, 754 P.2d 1070. See, also, *State v. Leary*, 12th Dist. Butler No. CA2013–01–009, 2013–Ohio–5670, ¶ 16 (noting that while the defendant therein "state[d] that he can't answer certain questions

without an attorney, he [made] this request ambiguous and equivocal by continuing to speak and expressing a willingness to continue answering more questions.").

**{¶44}** "In determining whether a reasonable officer conducting the interview would have understood that [the suspect] was asking for an attorney, we may consider what came before the request, but may not look to [the suspect's] subsequent statements to determine whether the initial request was ambiguous." (Emphasis deleted.) *Tolliver v. Sheets*, 594 F.3d 900, 922 (6th Cir.2010), quoting *Smith v. Illinois*, 469 U.S. 91, 97-98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). But, even then, a suspect's alleged invocation must be examined " 'not in isolation but in context.' " *State v. Cepec,* 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 37, quoting *State v. Murphy*, 91 Ohio St.3d 516, 520-521, 747 N.E.2d 765 (2001).

**{¶45}** "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis v. United States,* 512 U.S. 452, 462, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 18. The officers also have no obligation to ask clarifying questions to ascertain if the suspect is attempting to invoke his right to counsel. *Davis* at 461-462. Relying on *Davis*, the Supreme Court of Ohio held,

> If the suspect says something that may or may not be an invocation of the right, police may continue to question him; they need not treat the ambiguous statement as an invocation *or try to clear up the ambiguity*. See *Ross,* 203 Wis.2d at 75–76, 552 N.W.2d at 432, and fn. 4 (citing cases); *State v. Owen* (Fla.1997), 696 So.2d 715, 717–718; *State v. King* (Me.1998), 708 A.2d 1014, 1017. (Emphasis sic.)

*State v. Murphy*, *supra* at 521.

**{¶46}** "When the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity,' *Michigan v. Mosley,* 423 U.S. 96 (1975), because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present." *State v. Olge*, 5th Dist. Ashland No. CA 1111, 1996 WL 5516, *2.

**{¶47}** Within his brief, Eastman contends that "Less than a minute into the interview video, Eastman says "No. I haven't contacted an attorney, but I want one before I talk to you." (Appellant's Brief, p. 29). We have reviewed the video recording and the audio recording and can find no such quote. Instead, Eastman freely and openly talked with the officers about his plan to tell them everything and explain the evidence after he had the opportunity to ask an attorney a couple of questions. We do not find within the recorded encounter between the officers and Eastman an unambiguous request for an attorney that would prevent the officers from continuing their conversation with Eastman. He repeatedly offered that he would be disclosing all of his knowledge regarding this incident once he talked with an attorney. The officers proposed that he speak with an attorney and made arrangements for Eastman to speak privately with an attorney over a secure phone. Eastman accepted the offer, but after the call was concluded, Eastman reported that the attorney was not willing to accept his case. The detectives offered to locate a different attorney and Eastman declined, commented that he will wait to return to Ohio and then volunteered why he was seeking counsel.

**{¶48}** Eastman explained that his goal was to insure that his co-defendant, Ashley Quick was exonerated. He contended that the state was misinterpreting the facts, which led the officers to explain more of the evidence they had gathered. At that time, Eastman began engaging in a barter with the officers, explaining that he had committed several crimes and a murder that were not solved and that he would confess to every crime he committed in exchange for Quick's release. If his offer was refused, he planned to be such a difficult convict that he predicted the authorities would be forced to kill him.

**{¶49}** Eastman did not make an unambiguous request to speak with counsel before he talked with the detectives, but made it clear that he believed he possessed significant valuable information that he would disclose after speaking with an attorney. He made clear that his invocation of his right to consult with counsel and remain silent was limited to disclosing his knowledge of the facts surrounding the incident that lead to the charge against him and Ashley Quick. We find that Eastman had the right to make such a limited invocation of his right and that the officers were entitled to rely upon that limitation and yet still have conversations with him. *Cepec, supra* at ¶¶ 45-46, *Connecticut v. Barrett,* 479 U.S. 523, 529–30, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987).

**{¶50}** Eastman also contends that he was subject to a custodial interrogation without having been properly informed of and waiving his constitutional rights. The Fifth Amendment to the United States Constitution guarantees no person shall be compelled to be a witness against himself, and the Sixth Amendment to the United States Constitution guarantees the accused shall have the assistance of counsel. *Miranda v. Arizona,* 384 U.S. 436, 442, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1996). The inherently coercive nature of custodial interrogation heightens the risk a suspect will be denied the

Fifth Amendment privilege not to be compelled to incriminate himself because custodial interrogation can "undermine the individual's will to resist and * * * compel him to speak where he would not otherwise do so freely." *J.D.B. v. North Carolina*, 564 U.S. 261, 269, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (2011), quoting *Miranda* at 467; *Dickerson v. United States*, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

{¶51} In light of the inherent coercion involved in custodial interrogation, *Miranda* established "a set of prophylactic measures" to safeguard the constitutional privilege against self-incrimination. *Dickerson* at 435. Miranda held the State may not use a defendant's statements from custodial interrogation "unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda* at 444, 86 S.Ct. 1602. Prior to questioning, the police must warn the suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id*. In *Miranda,* the Supreme Court recognized the importance of a suspect's "real understanding" of his rights and his intelligent decision whether to exercise them. *Id.* at 469.

{¶52} The sole remedy for a *Miranda* violation is the suppression of evidence which was derived from the violation. *Bennet v. Passic* (C.A. 10, 1976), 545 F.2d 1260, 1263; see *Miranda, supra*, 384 U.S. at 479. Consequently, our review is focused on the statements offered at the trial and whether the trial court erred in failing to suppress them.

{¶53} Eastman's encounter with the detectives lends itself to a division into two distinct parts. The first part included an introduction by the officers, some statements regarding their purpose for meeting with Eastman and Eastman's repeated comment that

he would disclose his knowledge once he had the opportunity to talk with any attorney. That portion of the interview concluded with the detectives providing Eastman the opportunity to talk with an attorney in Ohio. None of the statements admitted as evidence were obtained in that portion of the interview.

{¶54} The second portion of the encounter between Eastman and the detectives begins with Eastman explaining that the attorney that he contacted was not available to assist him, and then, without prompting from either detective, Eastman began a narrative explaining why he wanted to talk with an attorney. His goal was to arrange a plea bargain where he not only admits to the current charges but also offers to confess to a list of other crimes, including an alleged murder, if the charges against Ashley Quick are dismissed and she is released. The state submitted two statements voluntarily offered by Eastman during this part of the interview, in which he insists that Quick was improperly charged and that Ashley knew only that he planned to engage in sex with Harris in exchange for cash. Voluntary statements such as these do not trigger constitutional protections. "The proposition that volunteered statements do not come within the protection of the Fifth and Sixth Amendments to the United States Constitution has been recognized and stated in varying factual contexts both before and after the decision in Miranda." (Citations omitted.) *State v. Perry,* 14 Ohio St.2d 256, 261, 237 N.E.2d 891, 894 (1968). The detectives were not required to prevent Eastman from continuing his explanation. His admissions were not the compelled product of custodial interrogation initiated by law enforcement officers, but were voluntary statements made while in custody. *Id.* at 62.

**{¶55}** The balance of Eastman's comments admitted into evidence were made after his rights were clearly explained. He expressly waived those rights and thus those statements were not obtained in violation of his constitutional rights.

**{¶56}** Because Eastman did not unambiguously assert his right to counsel, because he voluntarily offered several statements and continued to spontaneously offer information and respond to questions after waiving his rights, we deny his second assignment of error.

### III.

**{¶57}** In his third assignment of error, Eastman contends that his "Due Process right to a fair trial under the state and federal constitutions was violated by the trial court's refusal to grant a mistrial following the discovery of a victim memorial at the site of a jury view." Eastman specifically contends that "the trial court abused its discretion by denying a mistrial without questioning any of the jurors on whether they were biased by the victim memorial at the crime scene." He argues that the "memorial was likely to trigger an emotional reaction and the court presumed the jurors saw the memorial" and that "the court acted unreasonably by finding that a fair trial was still possible after the jurors were exposed to the victim memorial at the crime scene." (Appellant's Brief, p. 37).

**{¶58}** Eastman described the memorial as "a cross about a foot to a foot-and-a-half tall and some Easter eggs. The cross was carved with notes about Harris and a picture of Harris was attached to the cross." Counsel for both parties submitted photographs to the court. The jury was at the scene and presumably could have seen

the memorial, but they were not permitted to wander the property and did not get close to the memorial.

**{¶59}** The granting of a mistrial rests within the sound discretion of the trial court as it is in the best position to determine whether the situation at hand warrants such action. *State v. Glover*, 35 Ohio St.3d 18, 517 N.E.2d 900(1988); State v. Jones, 115 Ohio App.3d 204, 207, 684 N.E.2d 1304, 1306 (7th Dist.1996).

**{¶60}** "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened * * * ." *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490, 497(2nd Dist.1988). The granting of a mistrial is necessary only when a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1, 9 (1991); *State v. Treesh,* 90 Ohio St.3d 460, 480, 739 N.E.2d 749, 771 (2001). When reviewed by the appellate court, we should examine the climate and conduct of the entire trial, and reverse the trial court's decision as to whether to grant a mistrial only for a gross abuse of discretion. *State v. Draughn,* 76 Ohio App.3d 664, 671, 602 N.E.2d 790, 793–794 (5th Dist.1992), citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), certiorari denied, 472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 728 (1985); *State v. Gardner*, 127 Ohio App.3d 538, 540–541, 713 N.E.2d 473, 475(5th Dist.1998).

**{¶61}** In evaluating whether the trial judge acted properly in declaring a mistrial, the Supreme Court has been reluctant to formulate precise, inflexible standards. Rather, the Court has deferred to the trial court's exercise of discretion in light of all the surrounding circumstances:

> * * We think, that in all cases of this nature, the law has invested Courts of
>
> justice with the authority to discharge a jury from giving any verdict,

whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.  But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

*United States v. Perez*, 9 Wheat. 579, 22 U.S. 579, 580, 6 L.Ed. 165 (1824). *See, also, United States v. Clark*, 613 F.2d 391,400 (2nd Cir.1979), certiorari denied 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 as quoted in *State v. Widner,* 68 Ohio St.2d 188, 190, 429 N.E.2d 1065, 1066–1067(1981).

**{¶62}** In *Bruton v. United States*, 391 U.S. a]123, 135–136, 88 S.Ct. 1620, 20 L.Ed.2d 476(1968), the United States Supreme Court noted that "[a] defendant is entitled to a fair trial but not a perfect one. It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information.

**{¶63}** Eastman contends that the memorial was prejudicial in that it elicited an emotional reaction without distinguishing that emotional reaction from the emotion that is naturally part of a case involving a murder charge. *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 65 *holding modified by State v. Downour,* 126 Ohio

St.3d 508, 2010-Ohio-4503, 935 N.E.2d 828, ¶ 65; *State v. Scott,* 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 44.  Eastman does not contend and the record does not show that the memorial referenced him or the victim's manner of death, but instead lamented her passing.  We find that to the extent that the jurors may have noticed the memorial, it conveyed information that did no more than duplicate what was presented to the jury through the testimony of witnesses; that Donna Harris had passed away on this spot and that she left behind persons who mourned her passing.  The cross may have been interpreted to represent her Christian beliefs, but the record contained evidence that she was a member of a Christian church where she and Eastman met.

**{¶64}** We find that the court's cautionary instruction recognizing that the case might arouse sympathy, but that sympathy should be set aside when considering the facts of the case was sufficient to alleviate any potential bias as "[a] jury is presumed to follow instructions given it by the court." *State v. Allen,* 5th Dist. Delaware No. 2009-CA-13, 2010-Ohio-4644, ¶ 250.

**{¶65}** We find that the trial court did not abuse its discretion by refusing conduct a hearing on the impact of the memorial or to grant a mistrial.  Eastman's third assignment of error is overruled.

**{¶66}** The decision of the Delaware County Court of Common Pleas is affirmed.

By: Baldwin, J.

Wise, Earle, P.J. and

Delaney, J. concur.